INSURANCE COMPANY OF NORTH AMERICA, Appellant,

v.

HERITAGE BANK, N. A.

Nos. 78–2027, 78–2028.

United States Court of Appeals, Third Circuit.

Argued Jan. 18, 1979.

Decided March 19, 1979.

Charles W. Heuisler (argued), John B. Kearney, Archer, Greiner & Read, Haddonfield, N. J., for appellee.

Seymour Kurland (argued), Barbara Etkind, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant.

Before ADAMS and WEIS, Circuit Judges, and KUNZIG, Judge.*

OPINION OF THE COURT

PER CURIAM.

In order to appeal a judgment against them that had been entered in the Pennsyl-

    (c) the means employed are not improper. (emphasis added).

28.  Appellee's Brief at 13–14.

* Robert L. Kunzig, Judge, United States Court of Claims, Washington, D. C., sitting by designation.

vania state court system, Horace and Jean Billings were required to post a bond. To induce the Insurance Company of North America (INA) to post such a bond, the Billingses requested Heritage Bank to issue a letter of credit in the amount of $78,673.00 in favor of INA.[1] The letter of credit was issued on December 2, 1976, and by its terms was to remain valid until October 21, 1977. In the letter, Heritage committed itself to honor INA's "drafts at sight accompanied by written evidence to the effect that:"

1. "you (INA) have been called upon to make payment of loss, attorney's fees or other expenses by reason of executing an appeal Bond . . .," or that

2. "the premium thereon is unpaid and overdue," or that

3. "you (INA) have not received evidence satisfactory to you of the performance by the Principals of all its (sic) obligations in connection with the aforesaid bond was issued."

As of October 12, 1977, nine days prior to the expiration date of the letter of credit, the Billingses' appeal was still pending. In order to avoid finding itself in the position of having to pay on the appeal bond after the security for that bond, the letter of credit, had expired, INA presented Heritage with a sight draft in the amount of $78,673.00, accompanied by a written demand that Heritage honor the letter of credit. INA's demand, which apparently relied on the third condition of the letter of credit, stated that "[u]nder the terms of that letter, dated December 2, 1976, we are enclosing our sight draft in the amount of $78,673.00 and hereby certify that the liability under our bond . . . is still outstanding."[2] When Heritage refused to honor INA's demand, allegedly at the Billingses' request, INA filed this diversity suit in the United States District Court for the District of New Jersey. In the meantime, the appeal ran its course, the Billingses did not prevail, and INA paid the judgment holder, as it was obliged to do under the appeal bond.

Two issues were framed for decision in the district court: first, whether the third condition of the letter of credit authorized INA to demand payment from Heritage in the circumstances under which a demand was made, and second, whether INA's written demand complied with the terms of that condition. The district court dismissed INA's complaint for failure to state a claim upon which relief can be granted. It ruled that the third term of the letter of credit did not authorize INA's demand for payment because the Billingses had incurred no obligation to exonerate INA from liability under the appeal bond at any time before the conclusion of the appeal unless they failed to prosecute the appeal with effect. With respect to the second issue, the trial court stated that under the rule of strict compliance, Heritage was not required to honor INA's demand because it did not conform with the terms of the letter of credit. Because we agree with the district court's treatment of the second issue, we affirm.

---

1. The appeal bond named the Billingses as principal and INA as surety. After stating that these parties are bound to pay $78,673.00 to the Commonwealth of Pennsylvania for the use of the parties in the case from which the appeal was being taken, the bond concluded with the following:

Now the Condition of this Obligation is such, That if the said Appellant shall prosecute the appeal with effect and shall pay the amount finally adjudged to be due upon such order, judgment or decree, including interest and costs, and shall pay all costs and damages awarded by the Appellate Court, or legally chargeable against said Appellant, and shall pay all damages for injuries suffered by Appellees from the time of the decree entered and all mesne profits accruing after judgment, if any, then the above obligation to be void, or else to remain in full force and virtue.

2. INA's written demand continued:

Please be advised that the proceeds of our draft will be retained and used by us to meet any payments which we may hereafter be required to make under our bond and, further, we will refund to you all in excess of any amount which may have been paid by us in the meantime under our bond and any unpaid premiums due us on the said bond.

Originally conceived as a means of facilitating international sales of goods, the letter of credit has recently come to serve a variety of purposes, such as ensuring the payment of construction loans, guaranteeing the performance of obligations, and supporting the issuance of commercial paper. In contrast to its traditional function, the letter of credit in its newer variations frequently serves as a guaranty, and the issuer anticipates that it will not be called upon to honor the credit. Accordingly, this form of the device is known as a standby or guaranty letter of credit,[3] an appellation descriptive of the letter given to INA by Heritage.

Whatever the context in which it is being employed, the letter of credit serves the basic purpose of providing an inexpensive means of assuring payment in the course of a transaction to the party that furnishes the goods or services. It does this by creating a primary obligation on the part of the issuer of the letter of credit to pay upon the party's compliance with the terms and conditions enumerated in the letter, which usually calls for the presentation of specified documents. Thus, the letter of credit facilitates the underlying transaction both by substituting the known and secure credit of the issuer, such as a bank, for the unknown and perhaps risky credit of the other party to the underlying transaction, and by ensur-ing payment "up front," thereby shifting the burden of litigation to the dissatisfied purchaser of the goods or services.[4]

Ordinarily there are three distinct agreements in a letter of credit transaction: the underlying contract between the customer and the beneficiary which gave rise to their resort to the letter of credit mechanism to arrange payment; the contract between the bank and its customer regarding the issuance of the letter and reimbursement of the bank upon its honoring a demand for payment; and the letter of credit itself, obligating the bank to pay the beneficiary.[5] Since the letter of credit is completely independent from the other contracts, it is not surprising that the extent of the bank's undertaking is set forth solely in the letter.[6] Generally, the bank obligates itself to purchase specific documents and, unless otherwise stipulated, it need not monitor the underlying contract.[7] Rather, it has only to determine whether the documents presented appear on their face to be in accordance with the terms and conditions of the letter of credit, and its responsibility in this regard is entirely ministerial.[8] In fact, the issuer of the letter must pay the beneficiary regardless of whether the underlying contract has been performed, except when there has been fraud or some other irregularity, or an undertaking to the

---

3. *See generally* Verkuil, *Bank Solvency and Guaranty Letters of Credit,* 25 Stan.L.Rev. 716, 716–24 (1973).

4. *See,* Jarvis, *Standby Letters of Credit—Issuers' Subrogation and Assignment Right—Part I,* 9 U.C.C.L.J. 356, 357–60 (1977).

5. *See, e. g., Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 464–65 (2d Cir. 1970).

6. *See, e. g., Chase Manhattan Bank v. Equibank,* 550 F.2d 882, 885 (3d Cir. 1977).

7. Indeed, in one case, where an instrument that was denominated a "letter of credit" called for the bank to police the underlying construction contract and to pay upon its customer's default, the Ninth Circuit concluded that the instrument was an ordinary guaranty contract and not a letter of credit. The court explained:

> [W]here, as here, the substantive provisions require the issuer to deal not simply in documents alone, but in facts relating to the per-formance of a separate contract (the lease, in this case), all distinction between a letter of credit and an ordinary guaranty contract would be obliterated by regarding the instrument as a letter of credit.
>
> It would hamper rather than advance the extension of the letter of credit concept to new situations if an instrument such as this were held to be a letter of credit. The loose terms of this instrument invited the very evil that letters of credit are meant to avoid—protracted, expensive litigation. If the letter of credit concept is to have value in new situations, the instrument must be tightly drawn to strictly and clearly limit the responsibility of the issuer.

*Wichita Eagle & Beacon Publishing Co. v. Pacific National Bank,* 493 F.2d 1285, 1286–87 (9th Cir. 1974).

8. *See Chase Manhattan Bank v. Equibank, supra,* 550 F.2d at 885.

contrary.[9] Finally, with respect to the documents presented, both the bank and the beneficiary are held to a standard of strict compliance; "in the absence of conformity, the beneficiary cannot force payment and the bank pays at its peril." [10]

With this perspective, we turn to the case at hand, and note that the parties tender conflicting interpretations of the third condition of the letter of credit, the condition upon which INA relied in demanding payment. That provision required INA to submit "written evidence to the effect that" it had "not received evidence satisfactory to [it] of the performance by the [Billingses] of all [their] obligations in connection with which the aforesaid bond was issued." The parties disagree as to the meaning of that clause, and their dispute centers on whether the Billingses may be said not to have performed all their obligations at the time INA demanded payment from Heritage. Heritage expresses the view—adopted by the district court—that under the appeal bond the Billingses were under no duty to exonerate INA from liability before the appeal was concluded so long as they prosecuted the appeal with effect, and that consequently it could not be said that the Billingses had not performed all their obligations at the time INA demanded payment from Heritage. INA, on the other hand, contends that one of the Billingses' obligations under the appeal bond, and indeed its primary obligation, was to pay the judgment, thereby discharging the bond, and that when INA demanded payment, the Billingses had not yet performed that obligation.

■ Of course, if the outcome of this case were to turn on the proper interpretation of the third condition in the letter of credit, we would be required to construe any ambiguous language so as to best effectuate the bargain struck by the parties. Indeed, a possible interpretation—one that finds some support in the express terms of the third condition of the letter—is that Heritage granted INA a blank check, thereby allowing INA to demand payment at any time by presenting a written statement, prepared by INA, to the effect that it had not received evidence *satisfactory to it* of the performance by the Billingses of all their obligations under the appeal bond.[11] Thus, Heritage may have committed itself to pay INA upon receipt of that statement, whether or not the Billingses performed all their obligations, and whether or not any evidence in that regard were given to INA, but so long as INA states that whatever evidence it received, if any, was unsatisfactory to it. Under such an interpretation, Heritage could not refuse to honor a demand merely because the Billingses' appeal was not yet decided, for such a refusal would be at variance with the terms of the agreement between INA and Heritage, as well as with the general rule that the letter of credit is independent of the underlying contract between the customer and the beneficiary.

■ We need not, however, dwell on the proper interpretation of the third condition of the letter of credit. For even if that condition were construed in the light most favorable to INA and it were concluded that Heritage granted INA a blank check, it is evident that INA did not properly fill in the blanks. After the fact, INA argues

**9.** These limited circumstances are outlined in § 5–114 of the U.C.C., N.J.S.A. 12A:5–114, and developed in the case law. *See, e. g., Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975).

**10.** *Chase Manhattan Bank v. Equibank, supra,* 550 F.2d at 886.

**1·1.** The willingness of a bank to commit itself to pay upon presentation of a document prepared by the beneficiary and certifying that the bank's customer has defaulted on the underlying obligation is not uncommon in the context of standby letters of credit. Often, a standby letter of credit cannot feasibly make payment to the beneficiary contingent upon the submission of documents, such as bills of lading, obtained from disinterested parties and demonstrating that the beneficiary has performed at least part of the underlying contract and is therefore entitled to payment. *See* Arnold & Bransilver, *The Standby Letter of Credit—The Controversy Continues,* 10 U.C.C.L.J. 272, 279 (1978).

that its certification to Heritage on October 12 "that the liability under our bond . . on behalf of [the Billingses] is still outstanding" satisfies the requirement of the letter of credit. It concedes, as it must after *Chase Manhattan Bank v. Equibank,* 550 F.2d 882 (3d Cir. 1977), that the rule requiring strict compliance applies with full force in the context of standby and other less conventional types of letter of credit transactions. But it insists, on the strength of several decisions in the First Circuit,[12] that a "minor" deviation from the language called for in the letter of credit is acceptable, and that the issuing bank must be charged with knowledge of the meaning of the words as well as with an awareness of the factual realities surrounding the transaction. In addition, INA points out that the letter in question did not specify the language to be used in the document, but merely provided that there be "written evidence *to the effect that* " INA has not received evidence satisfactory to it that the Billingses have performed all their obligations under the appeal bond.

We are aware that some authorities have taken the position that the rule of strict compliance ought to be tempered to some extent.[13] This Court, however, has already cast its lot with the majority who "fear that the sacred cow of equity may trample the tender vines of letter-of-credit law"[14] and therefore maintain that, "[t]here is no room for documents which are almost the same, or which will do just as well."[15] Indeed in *Equibank* we specifically rejected the argument that the beneficiary of a standby let-

ter of credit, here INA, ought to be excused from strict compliance on the ground that the issuing bank already knew that its customer had failed to perform, thereby triggering the condition under which the beneficiary may make a proper demand for payment.[16]

As for INA's argument that the letter in question did not specify the precise terms to be used in the document accompanying a demand for payment, we agree that in view of the wording of the letter, no particular incantation was necessary. But whatever leeway INA may have been given in wording its document, it nonetheless failed to comply with the requirements of the letter. For its certification that "the liability . . is still outstanding" simply does not constitute "written evidence to the effect that [INA has] not received evidence satisfactory to [it] of the performance by the [Billingses] of all of [their] obligations in connection with which the aforesaid bond was issued."

It might seem harsh for INA in the end to pay its obligation under the appeal bond yet to be left without recourse against Heritage, which originally supplied the guaranty that induced it to sign as surety on that bond. In that the letter of credit called for INA to produce a document that was to be prepared by it, however, INA must itself assume the responsibility for this unfortunate result. Moreover, the alternative suggested by INA—that the Court overlook the deficiencies in INA's demand and place the burden of the loss upon Heritage, its guarantor—imposes upon Heritage more than it

---

12. *Flagship Cruises, Ltd. v. New England Merchants National Bank of Boston,* 569 F.2d 699 (1st Cir. 1978); *Banco Espanol de Credito v. State Street Bank & Trust Co.,* 385 F.2d 230, 234 (1st Cir. 1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968).

13. *See* cases cited in note 12 *supra.* *See also* Mentschicoff, *How to Handle Letters of Credit,* 19 Bus. Lawyer 107, 111 (1963).

14. Harfield, Code, Customs and Conscience in Letter-of-Credit Law, 4 U.C.C.L.J. 7, 11 (1972), *quoted in Chase Manhattan Bank v. Equibank, supra,* 550 F.2d at 885 n. 4.

15. H. Harfield, Bank Credits and Acceptances 73 (5th ed. 1974), *quoted in Chase Manhattan Bank v. Equibank, supra,* 550 F.2d at 885. *See also Courtaulds North America, Inc. v. North Carolina National Bank,* 528 F.2d 802, 805–06 (4th Cir. 1975). The rule has been applied with a slight degree of leniency, however, in the limited circumstance where a minor discrepancy exists between the actual terms of an invoice or bill of lading and the requirements of a letter of credit, thereby giving rise to litigation about the nomenclature used to refer to the goods. *See* cases cited in *Banco Espanol, supra,* 385 F.2d at 234 n. 5.

16. 550 F.2d at 885.

bargained for in its letter of credit. And, most importantly, such alternative would threaten the foundation upon which the letter of credit has grown and flourished. For, essential to the viability of this device is the certainty that it provides. Just as the beneficiary is induced to enter the underlying transaction because it is assured payment under specific terms agreeable to it, so too the bank assumes a primary obligation in part because its commitment is clearly defined within the four corners of the letter. If courts deviate from the rule of strict compliance and insist in certain undefined situations that banks make payments notwithstanding the fact that the beneficiary failed to comply with the terms stipulated in the letter of credit, the certainty that makes this device so attractive and useful may well be undermined, with the result that banks may become reluctant to assume the additional risks of litigation.

Accordingly, the judgment of the district court will be affirmed.