In re EASTERN FREIGHT WAYS, INC., Bankrupt.

Sidney B. GLUCK, Trustee in Bankruptcy of Eastern Freight Ways, Inc., Plaintiff,

v.

SEABOARD SURETY COMPANY, Manufacturers Hanover Trust Company, individually and as agent for other institutional lenders, International Harvester Credit Corporation, Fruehauf Corporation, the Chase Manhattan Bank, National Association, and Thomas J. Cahill, Trustee in Bankruptcy of Associated Transport, Inc., Defendants.

Bankruptcy No. 76–B–981.

United States Bankruptcy Court, S. D. New York.

Feb. 19, 1981.

Booth, Lipton & Lipton, New York City, for trustee of Eastern Freight Ways, Inc., by Edgar H. Booth and Michael Kleinerman, New York City, of counsel.

Anderson, Russell, Kill & Olick, New York City, for trustee of Associated Transport, Inc., by Stephen Pesner, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Bank by Edward Handelman, and Russell Brooks, New York City, of counsel.

Morgan, Lewis & Bockius, New York City, for Seaboard Surety Co. by James W. Harbison, Jr., and Thomas Stritter, New York City, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for Manufacturers Hanover Trust Co. by Theodore Gewertz, New York City, of counsel.

## OPINION

ROY BABBITT, Bankruptcy Judge:

### I. THE LEGAL SETTING

or

### HOW LAWYERS THREATEN TO DEPLETE OUR FORESTS

The dispute which is the subject of this decision involves directly two of the named defendants, and, depending on the outcome of that dispute, other defendants and the plaintiff, the trustee in bankruptcy of Eastern Freight Ways, Inc. (Eastern).

Both Eastern and its affiliate, Associated Transport, Inc. (Associated) came to this court in April, 1976 seeking the relief then afforded to financially harassed debtors by Chapter XI of the now repealed 1898 Bankruptcy Act, Sections 301 *et seq.*, 11 U.S.C. (1976 ed.) §§ 701 *et seq.*[1]

Recourse to the congenial climate of Chapter XI was, however, short-lived for both debtors and both were soon converted to bankruptcy liquidation cases. Sidney B. Gluck became Eastern's trustee and began this suit against seven defendants, including the trustee in bankruptcy of Associated, by following the adversary proceeding route described in Part VII of the 1973 Bankruptcy Rules. Rules 701 *et seq.*, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi *et seq.*

He filed a complaint, as required by Rule 703, 411 U.S. 1069, 93 S.Ct. 3147, 37 L.Ed.2d lxvi, which alleged several causes of action against various defendants but not necessarily related to each other. Insofar as is relevant to the subject of this decision, the trustee in bankruptcy asserted a cause of action against the defendant Seaboard Surety Company (Seaboard) based upon various claims by shipper-customers of both Eastern and Associated for cargo damage presented to Seaboard, and the accommodation of such claims from the proceeds of a letter of credit procured from defendant, Chase Manhattan Bank (Chase). Lurking in this overall dispute was the charge that Seaboard threatened to or already had improperly set-off property of the Eastern estate which property, in the form of accounts receivable, had been given as security for outstanding indebtedness to most of the other defendants.[2]

By that action Eastern's trustee sought first to bar Seaboard from soliciting Eastern's customers in order to achieve a set-off of cargo claims to be paid by Seaboard as Eastern's surety against freight charges owed to Eastern by those customers. The trustee saw these freight charges as Eastern's receivables and therefore property within Section 70(a) of the Act, 11 U.S.C. (1976 ed.) § 110(a). As such, he insisted that Seaboard could not set-off since it had equitable recourse for its disbursement of the cargo claims of Eastern's customers in the $2 million Chase letter of credit.

The trustee also sought a determination that the proceeds of this letter of credit could be applied only against cargo claims against Eastern and that, in any event, Seaboard had no right of set-off.

Seaboard moved to dismiss the complaint for failure to state a claim as to the merits and upon the further ground that this court lacked the necessary bankruptcy jurisdiction to try the dispute.[3]

---

**1.** Although these Chapter XI petitions were filed under the 1898 Bankruptcy Act, which was repealed by Section 401(a) of Title IV of the 1978 bankruptcy reform statute, Pub.L. 95–598, 92 Stat. 2549, 2682, effective October 1, 1979, the former continues to govern cases filed under its provisions. Section 403(a) of the 1978 legislation insists upon this. See *Guardian Mortgage Investors v. Unofficial Noteholders-Debentureholders, etc.*, 607 F.2d 1020 (2d Cir. 1979) at fn. 6; *Geiger Enterprises, Inc. v. Official Creditors' Committee of Geiger Enterprises, Inc.*, 635 F.2d 106 at fn. 2 (2d Cir.).

**2.** Also named as a defendant was the trustee in bankruptcy of Associated, so cited because of the possible impact on Eastern's assets of an improper credit to Associated.

**3.** Under the 1898 Bankruptcy Act, the bankruptcy court's jurisdiction over controversies between the trustee and third parties was said to rest on property in the court's actual or constructive possession or on some mode of conferring jurisdiction, otherwise wanting, by consent. Sections 2(a)(7) and 23 of that Act, 11 U.S.C. (1976 ed.) §§ 11(a)(7) and 46, and the judicial gloss interpreting the reach of the juris-

This court overruled Seaboard's objection to its jurisdiction, gave Eastern's trustee a judgment declaring that Seaboard could claim no right of set-off until the proceeds of the letter of credit had been exhausted, enjoined Seaboard from soliciting set-offs until further order, and directed the defendant to render an accounting of the cargo claims. 13 CBC 131 (1977). The District Court, acting as an appellate tribunal, Section 39(c) of the Act, 11 U.S.C. (1976 ed.) § 67(c), affirmed. 453 F.Supp. 934 (1977). The Court of Appeals also affirmed, 577 F.2d 175 (1978), but modified this court's order

> "to direct the trustee to collect [Eastern's] accounts receivable, but to hold in a special account pending final resolution of this litigation such sums as are collected from shippers who have asserted claims against Seaboard."

This modification was designed to help protect Seaboard by allowing an adjustment between all parties should Seaboard show it could set-off. 577 F.2d at 181.

Eastern's trustee then filed an amended complaint and there included a cause of action against Seaboard for money representing so much of the $2 million letter of credit as was attributable to set-offs by Seaboard against the Eastern freight charge receivables. Following a lively round of further proliferation of legal papers, defendant Chase sought a declaratory judgment in its motion for summary judgment under Bankruptcy Rule 756, 411 U.S. 1084, 93 S.Ct. 3159, 37 L.Ed. lxxii, that Seaboard was entitled to use the proceeds of the letter of credit to satisfy only those bonds which Seaboard had written for Eastern; that Seaboard account; that, pursuant to the terms of the letter of credit Seaboard remit to Chase the difference between the amount drawn down and the amount spent in satisfying claims against Eastern only; and that Eastern's trustee is not entitled to any money from Seaboard from the proceeds of the letter of credit.[4]

Seaboard cross-moved for judgment declaring that it could apply the proceeds to liabilities of both Eastern and Associated which it had paid.

The trustee, having started all this, filed no formal motion concerning the reach of his interest. However, he did file a memorandum siding with Chase's position that Seaboard's recourse to the letter of credit should be limited to claims asserted only against Eastern. But he resisted Chase's motion to the extent he insists that the remaining proceeds of the letter of credit

---

dictional limitations there described made this clear. See, *inter alia, Katchen v. Landy,* 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966); *Cline v. Kaplan,* 323 U.S. 97, 98–99, 65 S.Ct. 155, 156, 89 L.Ed. 97 (1944); *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876 (1940); *Taubel-Scott-Kitzmiller Co. v. Fox,* 264 U.S. 426, 432–4, 44 S.Ct. 396, 398, 68 L.Ed. 770 (1924).

Whatever else the 1978 Code achieves, or fails to achieve; however the House and the Senate might have differed on that statute's treatment of large policy considerations, both chambers of the national legislature agreed that true bankruptcy reform made the interment of the bifurcation of a bankruptcy court's jurisdiction to administer estates under the 1898 Act an imperative. See H.R.Rep.No.95–595, 95th Cong., 1st Sess. 43–49, 445–6 (1977); Sen.Rep. No.95–989, 95th Cong., 2d Sess. 17, 153 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; 124 Cong.Rec. H. 11116 (September 28, 1978); 124 Cong.Rec. S. 17432 (October 6, 1978). The now styled pervasive jurisdiction given the bankruptcy courts in cases filed under the 1978 statute, effective October 1, 1979, was achieved by new 28 U.S.C. § 1471(b) read with subsection (c), one of the twelve sections comprising a new Chapter 90 added to Title 28, United States Code by Section 241(a) of the amendments which make up Title II of the 1978 bankruptcy law.

4. The opinion of the Court of Appeals in the earlier journey of this dispute to that court explains the formation and development of the relationship between the now bankrupts, Seaboard, Chase and those defendants asserting security interests in Eastern's property including its accounts receivable, 577 F.2d at 177–8. Each has a clear interest although not actively litigating these motions; the defendants secured by Eastern's receivables who would naturally fret if the account debtors had set-off have an interest. The terms of the letter of credit, read as Chase would have it, would require a refund to Chase so that it has an interest. Associated's trustee would be affected by Seaboard's having obtained solicited set-offs by that bankrupt's account debtors.

(after proper utilization by Seaboard to the extent of Eastern's liabilities) should be turned over to him insofar as these represent funds improperly set-off by Eastern's debtors at Seaboard's request. He argues that this court may, in its overall resolution of the competing interests in the letter of credit, deal with the effect of the set-off by the account debtors. See 6 Moore's *Federal Practice*, (2d ed. 1976) ¶ 56.12.

As these are motions for summary judgment under Rule 56, F.R.Civ.P., applicable in this court pursuant to Rules 756 and 914, 411 U.S. 1084, 1098, 93 S.Ct. 3159, 3170, 37 L.Ed. lxxii, lxxviii, this court is sensitive to the prerequisites for making it unnecessary for the curtain to be raised at an evidentiary proceeding, *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975); *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978). Accordingly, to satisfy itself that the material and controlling facts are not in dispute and that the dispute centers on purely legal issues, the court has examined with care all the papers relevant to those issues. The court finds therefrom that there is no dispute as to the facts which control resolution of the vexing issues of law. Although the Court of Appeals, when it saw these litigants, 577 F.2d 175, recited the facts in Part I of the opinion, those facts told only the story relevant to the legal issues dealt with there. This chapter goes well beyond, and therefore it is not inappropriate to state them all.

## II. THE CONTROLLING FACTS

### or

### HOW THE PARTIES GOT TO KNOW EACH OTHER

Eastern and Associated were licensed common carriers subject to the jurisdiction of the Interstate Commerce Commission. In 1972, Eastern purchased approximately 46% of the outstanding stock of Associated. ICC regulations allow such trucking firms to be self insurers with respect to cargo claims, subject to the filing of appropriate surety bonds. See 49 CFR Part 1043. Both Associated and Eastern utilized such "self insurance programs". Chase had previously issued letters of credit in connection with Eastern's program. Seaboard had written the bonds necessary for Associated's program for many years requiring only minimal collateral.

By late 1973 Associated's financial picture had darkened; its ability to pay a steadily increasing number of claims had deteriorated, a fact noted by Seaboard which thereupon insisted that Associated substantially increase the collateral if it were to continue its bonding program. Associated was required to deposit $50,000 a month in negotiable instruments and other security with Seaboard. By September, 1974, Seaboard held over $600,000 in collateral in the form of treasury bills, certificates of deposit and letters of credit, all readily convertible into cash. It was the possible release of this collateral to Associated that became the focus of the attention of all parties with an interest in Associated's continuing viability as its financial crises worsened.

By the summer of 1974 Associated's bankers came to the conclusion that the company could not continue as a going concern unless some form of integration with Eastern were achieved. In July, 1974, a banker's sub-committee was created for the detailed planning that would be necessary to effectuate a transition to Eastern management which, it was hoped, would relieve the financial crisis. A precondition to such a combined Eastern-Associated operation was the ICC temporary grant of authority. The major benefit of this "de facto" merger to Associated would be the release by Seaboard of the collateral it held and the cessation of the $50,000 monthly cash outlay Associated was making under its then present self-insurance program. Thus, by July 1974, Seaboard had agreed with Eastern and Associated that, subject to ICC approval, Eastern and Associated would be blended into a combined operation and a single letter of credit would be issued. Seaboard would then release Associated's collateral. Seaboard would continue to write its bonds for Associated, and would begin to

write new bonds for Eastern. All this was subject to the required grant by the ICC of authority for Eastern to manage Associated, which came on August 8, 1974.

On that same day, Eastern and Associated entered into a written management agreement which granted Eastern a wide range of powers over virtually all aspects of Associated's business. This agreement empowered Eastern to:

"sell, substitute or trade, operating property of every kind and nature; to lease and sublease terminal facilities; to refinance debts; to borrow money; to sell and/or exchange, mortgage or encumber assets in the course of [Associated's] business; and *to do any and all other things necessary and proper in connection with the management of [Associated's] business* . . . ."

(bracketed material and emphasis added)

It also gave Eastern:

"the right, but not the obligation, of itself making or causing any of its subsidiaries to make loans and advances to [Associated] ('loans and advances' being deemed to mean not only monetary advances, but also the supply of parts and equipment, use and occupancy of terminal facilities, rendition of freight and cartage services,

*providing insurance coverage* and anything else of any kind or nature constituting value) . . . ."

(bracketed material and emphasis added)

and to

" . . . *make all decisions with respect to* consolidations, eliminations, joint agreements, or other charges [sic] with respect to the conduct of maintenance functions, operational functions, terminal functions, traffic functions, *insurance functions and general administrative functions of [Associated]*."

(bracketed material and emphasis added)

Cloaked with all this authority, Eastern immediately took control of Associated and Eastern's officers became the officers of Associated. Additionally, pursuant to the negotiations with Seaboard, Eastern and Associated executed a collateral agreement with Seaboard on August 26, 1974, whereby the combined companies agreed to furnish to Seaboard two million dollars as collateral for the bonds written by Seaboard in furtherance of the companies' insurance programs.

On September 12, Chase[5] delivered to Seaboard an irrevocable letter of credit in the amount of $2 million.[6] Seaboard re-

---

5. Although the letter of credit was issued by Chase, its own participation was limited to $1 million. First National Bank of Boston and Manufacturers Hanover each agreed to share in the credit to the extent of $500,000 each.

6. That letter of credit, in relevant part, reads as follows:

"We hereby authorize you to draw on The Chase Manhattan Bank N.A., New York, New York by order of The Chase Manhattan Bank, N. A. Branch No. 26 (Pennsylvania Branch) and for account of Eastern Freightways Inc., Eastern and Moonachie Avenues, Carlstat, New Jersey 07072 up to an aggregate amount of Two Million U.S. Dollars. Available by your drafts at Sight. Accompanied by: Your written certification stating that you have not been released from liability under the surety bond(s) or undertaking(s) you have executed on behalf of Eastern Freightways Inc. It is a condition of this Letter of Credit that it shall be deemed automatically extended without amendment for an additional period of six months from the present or each future expiration date unless not less than thirty (30) days prior to such date we shall notify you in writing that we elect not

to consider this Letter of Credit renewed for any such additional period. Upon receipt by you of such notice you may draw hereunder within the then applicable expiration date for the balance then remaining in this Letter of Credit by means of your drafts on us at sight accompanied by your written certification that you have not been released from liability for any obligation incurred or which may be incurred by you as a result of having executed or having procured the execution of surety bond(s) or undertaking(s) as aforesaid. This certification must further state that in the event your liability under the bond(s) or undertaking(s) is satisfied you will refund to us the amount drawn, less any amount(s) which may have been paid by you in the meantime under the bond(s) or undertaking(s) and any unpaid premium due you on said bond(s) or undertaking(s). Drafts must be drawn and presented at this office not later than March 12, 1975 or any extended date as provided herein. The amounts thereof must be endorsed on this Letter of Credit. We hereby agree with the drawers, endorsers, and bona fide holders of all drafts drawn under and in compliance with the

quired all letters of credit issued as collateral to have a term of at least six months with an automatic renewal clause. Seaboard supplied to Chase a page containing its preferred language. Upon receipt of the letter of credit, it was .examined by Seaboard's legal department where its form was approved, and there is no dispute that on its face the credit was to the account of Eastern, and bore no reference to Associated.

Following these events, Seaboard returned the Associated collateral it held, released the bonds required for Eastern's insurance program and continued to issue the bonds for Associated's insurance program.

At the time in April, 1976 when both debtors came into this court, approximately 20,000 cargo claims were outstanding against them. Upon these, Seaboard was potentially liable and it immediately acted to realize upon its collateral. It drew down the full $2 million proceeds of the letter of credit by tendering to Chase the original letter of credit number 252636, a sight draft for $2 million, and a letter certifying the conditions required for drawing down the proceeds of the letter. One of these conditions was a certification to Chase that Seaboard had not been "released from liability under the surety bonds or undertakings executed by it on behalf of 'Eastern Freightways, Inc.'" Seaboard also certified that it would refund to Chase those proceeds not utilized to satisfy Seaboard's liabilities on the bonds for which the letter of credit had been given as collateral security.

Seaboard then began applying the proceeds to its liabilities on bonds or undertakings for which the credit was established, as it understood, for both Eastern and Associated bonds.

## III. THE LEGAL ISSUES ON THE SUMMARY JUDGMENT MOTIONS

### A. THE OPERATIVE DOCUMENT

or

### HOW CHASE FAILED TO PROTECT ITSELF

It is Chase's position that Seaboard's use of the proceeds after draw-down is governed only by the terms of the credit, an undeniably clear and unambiguous document bearing only Eastern's name without any reference to Associated. See fn. 6 for its terms. Accordingly, Chase reasons, this issue is bereft of factual questions requiring an evidentiary hearing, and is susceptible of resolution purely on an interpretation of the credit. *Corporacion de Mercadeo Agricola v. Mellon Bank International*, 608 F.2d 43 (2d Cir. 1979).

This court starts its inquiry with consideration of the unique principles of law governing "credit" transactions.[7] The foundation of Chase's motion is the well-established rule that a letter of credit is an independent contract between the issuer, here Chase, and the beneficiary, here Seaboard, which must be interpreted and enforced without reference to any underlying contracts or transactions. *Venizelos, S. A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970). Chase makes this statement the foundation for its view of the obligations of both Seaboard and itself. Chase insists that the terms of the letter of credit are clear, that it has nothing to do with Associated's liability on its own cargo liability claims, and that Seaboard can in no way introduce anything into the dispute to sweep Associated into the protection the letter of credit gave to Eastern. So, Chase concludes, Seaboard had no right to use any

terms of this credit that such drafts will be duly honored upon presentation to the drawee. This credit is subject to the Uniform Customs and Practice for Documentary Credits (1962 revision), International Chamber of Commerce Brochure No. 222...."

7. Pursuant to the express terms of the credit and § 5–102(4) of the Uniform Commercial Code, the Chase credit is governed by the Uniform Customs and Practice for Documentary Credits (1962 revision), International Chamber of Commerce No. 222. (UCP). In the definitions of the UCP, letters of credit or credits, by their nature, are explained as

> "... separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts."

of the Chase credit for liabilities incurred under Associated bonds, a position happily adopted by Eastern's trustee.

Chase observes the unique fact that a letter of credit is actually but one facet of a three faceted stone, each of which is treated without reference to the others. These facets are separate. The first is between the issuing bank (Chase) and its customer, (Eastern); the second is between the issuing bank and the beneficiary (Seaboard). *This is the letter of credit.* The third is between the account party (Eastern) and the beneficiary (Seaboard). *This is the underlying agreement.* See *Venizelos, S. A. v. Chase Manhattan Bank, supra*; Squillante, *Letters of Credit: A Discourse* (Part I), October, 1979 Commercial Law Journal 372.

It is this accepted independence of the transaction between Chase, as the issuer, and Seaboard, as beneficiary, which is the linchpin of Chase's motion for judgment in its favor. Chase seizes on judicial language to reinforce its view that

"The essence of a letter of credit is the promise by a bank, or other issuer to pay money. The key to the uniqueness of a letter of credit and its commercial vitality is *that the promise by the issuer is independent of any underlying contracts.*" (emphasis supplied)

*Pringle-Associated Mortgage Corp. v. Southern National Bank,* 571 F.2d 871, 874 (5th Cir. 1978).

This rule of independence is therefore pressed by Chase for judgment that the terms of the letter of credit alone determine the proper disposition of the proceeds of that credit in Seaboard's hands. See *e. g., H. Ray Baker, Inc. v. Associated Banking Corp.,* 592 F.2d 550 (9th Cir. 1979), *cert. den.* 442 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979); *International Leather Distributors, Inc. v. Chase Manhattan Bank,* 464 F.Supp. 1197 (S.D.N.Y.1979), affirmed without opinion, 607 F.2d 996 (2d Cir. 1974); *United Technologies Corp. v. Citibank, N. A.,* 469 F.Supp. 473 (S.D.N.Y.1979).

As the Court of Appeals for the Third Circuit said:

"Since the letter of credit is completely independent from the other contracts, it is not surprising that the extent of the bank's undertaking is set forth solely in the letter. Generally, the bank obligates itself to purchase specific documents and, unless otherwise stipulated, it need not monitor the underlying contract." (footnotes omitted)

*Insurance Company of North America v. Heritage Bank, N.A.,* 595 F.2d 171, 173 (3d Cir. 1979).

The parts of the letter of credit stressed by Chase is the "Account Party" heading bearing only Eastern's name, and the provision requiring Seaboard to certify in writing upon draw down:

"You have not been released from liability under the surety bonds or undertaking you have executed on behalf of Eastern Freightways, Inc."

Chase insists that it is this provision that specifically addresses the question as to whose liabilities the credit covers and emphatically answers that it covers only Eastern liabilities.

In further support, Chase invites the court to apply general contract principles to bolster its stance against the introduction of extrinsic evidence since the letter of credit is complete on its face. See *Venizelos, supra,* at 466; *J. Zeevi & Sons, Ltd. v. Grindlay's Bank (Uganda) Limited,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. den.* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975); *Fidelity Bank v. Lutheran Mutual Life Ins. Co.,* 465 F.2d 211 (10th Cir. 1972); See also *Schulman Investment Co. v. Olin Corp.,* 477 F.Supp. 623 (S.D.N.Y. 1979). Accordingly, Chase says that summary judgment is clearly appropriate for interpretation of the language contracting parties write is a purely legal issue in light of acknowledged principles such as that recited in *Venizelos, supra,* at 460, that as between the beneficiary of a letter of credit and the issuer, if ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify. See also *Lamborn v. National Park Bank of New York,* 212 App.Div. 25, 208 N.Y.S. 428,

(1st Dept.1925), affirmed 240 N.Y. 520, 148 N.E. 664 (1925).

With all this, this court does not quarrel. But it does not go far enough to warrant judgment for Chase, for it does not follow that the letter of credit and its reach stand disembodied from the other instruments of the three-cornered transaction present here.

The letter of credit, a creature of the law merchant, is virtually impossible to define in a manner that is either exact or concise. However, for the purpose of this dispute, it may be defined as an unconditional promise on the part of the issuer to pay the draft or demand for payment presented to it if the documents accompanying the draft comply with the terms of the credit. *United Technologies Corp. v. Citibank, N. A. supra,* at 477. But each credit is different as it molds and colors itself to the environment of the transaction involved. This chameleon-like characteristic is what makes it a dependable and useful financing device.

■■■ A credit's *raison d'etre* in the commercial world and its most distinguishing feature is its ability to lend support to some arrangement by which one party has undertaken to pay money to another. The letter of credit, unlike a guaranty, creates a primary obligation on the part of the issuer, not qualified by or dependent on performance by anyone else and whose obligation is exclusively defined by the credit. *Contractual Defenses as Claims to the Instrument: The Right to Block Payment on a Banker's Instrument,* 58 Or.L.Rev. 283 (1979). This commercial device thus permits the account party to substitute for its own possibly parlous financial condition the direct obligation of the more financially acceptable third party issuer which becomes primarily liable upon the letter. Squillante, *Letters of Credit: A Discourse* (Part I) *supra.* Unlike a guaranty, which is a security device, a letter of credit is a financing device involving a documentary transaction in which the parties deal exclusively in written representations, not extraneous facts, the essence being precise conformity with the terms expressed in the letter of credit. *Wichita Eagle & Beacon Pub. Co. v. Pacific National Bank,* 493 F.2d 1285 (9th Cir. 1974); H. Harfield, *Letters of Credit* 39 (1979), published by ALI–ABA.

■■ A fundamental element in the regulation of letter of credit transactions is the necessity for strict compliance with the terms of the credit by the beneficiary. The cases in the area repeatedly refer to the statement in *Equitable Trust Co. v. Dawson Partners* that:

"There is no room for documents which are almost the same or which will do just as well."

27 Lloyd's List L.R. 49 (1927). The issuer is entitled to insist upon precise performance by the beneficiary of the terms specified in the credit. The beneficiary's entitlement to payment is dependent upon strict performance of every term of the credit. *Corporacion de Mercadeo Agricola v. Mellon Bank International,* 608 F.2d 43 (2d Cir. 1979); *Chase Manhattan Bank v. Equibank,* 550 F.2d 882 (3d Cir. 1977). The Court of Appeals for the Fourth Circuit wrote:

" . . . as the predominant authorities unequivocally declare, the beneficiary must meet the terms of the credit . . . and precisely . . . if it is to exact performance of the issuer. Failing such compliance there can be no recovery from the drawee."

*Courtaulds North America, Inc. v. North Carolina Bank,* 528 F.2d 802, 805–806 (4th Cir. 1975).

This fastidious requirement for exacting conformity is the keystone of a credit transaction. To be sure, as here, the uses of credits moved away from the sale of goods context and the documents involved are no longer those conventionally encountered in the areas of sale or shipment of merchandise. But the practical rule of documentary conformity still controls. *Wichita Eagle & Beacon Pub. Co. v. Pacific National Bank, supra,* at 1285; H. *Harfield, supra,* at 39.

Chase draws comfort from this for it continues to press the point that only the terms of the letter dictate the use of the proceeds.

But there is a chink in this armor for Chase ignores totally the other agreements involved and that without these, there would have been no letter of credit. The fact is that the rules just discussed are talismanic only as to the letter of credit transaction itself. They do not govern the use of proceeds after draw down, for when the proceeds are in the beneficiary's hands the underlying agreement controls, unless otherwise unequivocally directed.

On April 28, 1976, Seaboard complied with the conditions of the Chase irrevocable credit by submitting the letter of credit, a two million dollar sight draft, and a certification letter. This submission conformed to all requirements set forth in the credit, and Chase paid out the proceeds.

It is only this draw down by Seaboard to which the above-mentioned rules apply. Basically, as between Chase and Seaboard, the terms of their documents were met. *International Leather v. Chase Manhattan Bank, supra; Insurance Co. of North America v. Heritage Bank, supra.*

See also UCP, Articles 7, 8 [8] (1962 Revision). The conformity of these documents to the terms of the letter of credit is the issuing party's sole concern. Chase itself recognizes this:

"The drawee [Chase] is involved only with documents, not with merchandise. Its involvement is altogether separate and apart from the transaction between the buyer and seller; its duties and liability are governed exclusively by the terms of the letter, not the terms of the parties' contract with each other."

*Courtaulds North America, Inc. v. North Carolina National Bank,* 528 F.2d 802, 805 (4th Cir. 1975).

The provisions of the letter of credit dealt with the mechanics for draw down and not with the purpose for which the proceeds were made available. This aspect is dealt with by the underlying agreement between the beneficiary, Seaboard and the account party, Eastern. If it were otherwise, the utility of a letter of credit would be frustrated and its unique nature in the world of commerce obliterated as was noted by the Court of Appeals for the Ninth Circuit in these words:

"Where the substantive provisions require the issuer to deal not simply in documents alone, but in facts relating to the performance of a separate contract, all distinction between a letter of credit and ordinary guarantee are obliterated."

*Wichita Eagle & Beacon Pub. Co. v. Pacific National Bank,* 493 F.2d 1285 (9th Cir. 1974); *Contractual Defenses as Claims to the Instrument: The Right to Block Payment on a Bankers Instrument,* 58 Or.L. Rev. 283 (1979).

Chase, upon submission of the papers by Seaboard, examined them, and, as conceded in its statement pursuant to General Rule 9(g), concluded that Seaboard had properly complied. Its sole duty was to determine whether the documents were on their face in accordance with the terms and conditions of the letter of credit, a purely ministerial responsibility. *Chase Manhattan Bank v. Equibank, supra,* at 885, *Insurance Company of North America v. Heritage Bank, N. A.,* 595 F.2d 171, 173 (3d Cir. 1979). When Chase paid out the proceeds by issuing a $2 million check to Seaboard, the letter of credit became a fully executed contract. All that remained was performance of a promise made by Seaboard in its April 28, 1976 certification letter that it would refund to Chase the funds remaining after Seaboard's liability "under the bonds or undertakings for which the letter of credit was established as collateral security."

8. "Article 7. Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit.

Article 8. In documentary credit operations all parties concerned deal in documents and not in goods. ·

Payment, acceptance or negotiation against documents which appear on their face to be in accordance with the terms and conditions of a credit by a bank authorized to do so, binds the party giving the authorization to take up the documents and reimburse the bank which has effected the payment, acceptance or negotiation."

Nothing in the letter of credit spoke to the purpose for which it was established, for this was dealt with by the underlying agreement among Eastern, Associated and Seaboard. The scope of the letter of credit had nothing whatever to do with the use of the proceeds.

■ The court does not ignore the line of cases holding that enforceability of a letter of credit may depend upon performance of the underlying agreement. But, unless the irrevocable credit unequivocally conditions enforceability upon performance of an underlying obligation, the underlying contract remains an independent document not governed by the terms of the credit. Squillante, *Letters of Credit: A Discourse* (Part II), *supra*, at 427. It is a fundamental principle that the issuing bank is not required to look beyond the terms of the credit and the proferred documents to decide whether to honor the drafts unless it has been agreed otherwise. *Letters of Credit: Current Theories and Usages*, 39 La.L.Rev. 581 (1979); *Kingdom of Sweden v. New York Trust Co.*, 197 Misc. 431, 96 N.Y.S.2d 779, 787 (1949). In short, unless clear conditions are contained in a letter of credit, performance of an underlying contract is not a condition precedent to enforceability of the credit for the letter of credit remains a wholly independent contract.

■ Simply put, a letter of credit is merely a promise by the issuing bank to pay money in order to facilitate a commercial transaction by assuring such payment. No matter how unusual the purpose for this facilitation, the letter must be viewed in the light of common sense principles developed to acknowledge the role of this unique device in the world of commerce and its function as a guarantee of payment. Mere general references to underlying agreements are surplusage and are not to be considered in deciding whether the beneficiary has complied with the terms of the credit. It is only the most insistently clear language that will permit a court to deviate from this rule. *Pringle-Associated Mortgage Corp.*, *supra*, at 874, where it was held that the

court below had erred in construing that letter by reference to the underlying agreement.

Thus, Chase comes out where it does because it has gone in on a misapprehension of the operative agreement. The cases it cites deal with challenges to the issuing banks' decision to make or withhold payment and not, as here, with the use of proceeds by the beneficiary after payment.

Here, as seen, the issue is the proper disposition by a beneficiary of proceeds after a proper draw down and the concomitant refund obligation in the credit. And, however separate the letter of credit may be, it has nothing to do with this dispute. *Maurice O'Meara Co. v. The National Park Bank of New York*, 239 N.Y. 386, 146 N.E. 636 (1925).

## B. THE RIGHT TO A REFUND

### or

### CHASE'S EYE IS STILL ON THE WRONG SPARROW

The few reported cases bearing on the issue of a beneficiary's refund obligation have been resolved by recourse to the underlying commercial transaction between the beneficiary in this dispute, Seaboard, and the account parties here, Eastern and Associated. In *Imbrie v. D. Nagase & Co., Ltd.*, 196 App.Div. 380, 187 N.Y.S. 692 (2d Dept.1921) and *Bank of East Asia v. Pang*, 249 P. 1060 (Wash.1926), the respective issuing banks had paid the proceeds upon presentation of proper papers by those beneficiaries and upon learning of the alleged improper performance by the sellers under the underlying commercial transactions, the banks sued to recover the proceeds. In both cases, the courts ruled against the banks, holding that they could not maintain an action for recovery of proceeds as they were precluded from inquiring into the extent of performance of the underlying contract. The beneficiary's use of and right to retain the proceeds was governed, not by anything in the respective letters of credit, but by its agreement with the account party. Thus, in this dispute, Seaboard's retention and use of the $2 million proceeds is

governed by its underlying agreement with both bankrupts.

Recently, the same principle was applied in *United States v. Sun Bank of Miami*, 609 F.2d 832 (5th Cir. 1980), a suit brought against the bank for wrongful dishonor. There, the bank's letter of credit purported to express the purpose for which the proceeds were to be applied—completion of a construction contract.[9] However, as the bank had not required documentation of that use as a condition to drawing down, the beneficiary was not precluded from drawing down for a different purpose—satisfaction of a tax liability to the United States. This decision reinforces the proposition that the language in a letter of credit cannot limit the use of the proceeds by the beneficiary unless the letter precisely directs such a limitation. Indeed, the letter of credit in that case, fn. 9, was far more precise than the one on which Chase rests its case here.

■ The letter of credit at issue here made no reference to the uses to which Seaboard might apply the proceeds. Chase's letter, unlike that of the bank in the case just cited did not even mention the general purpose for which the proceeds were to be made available. The sole requirement that Seaboard certify that it had not been released from liability on its bonds written on behalf of Eastern does not address the question of application of the proceeds by the former. And the mere mention of Eastern alone as the Account Party cannot be taken as a limitation on Seaboard's application of the proceeds to both Eastern and Associated.

It follows therefore that Chase's motion for judgment in its favor must be denied as a matter of law.

## C. SEABOARD'S USE OF THE PROCEEDS

*or*

## HOW SEABOARD PROTECTED ITSELF

■ It also follows from that same law that Seaboard is entitled to judgment in its favor that the proceeds of the letter of credit properly collateralized bonds or undertakings which Seaboard wrote for both Eastern and Associated.

Whatever limitations there were on Seaboard's use of the proceeds of the letter of credit must be found, if any there are, in the underlying agreement which plainly provides that Seaboard be furnished with $2 million as collateral for bonds or undertakings it would write for:

> "Eastern Freight Ways, Inc. and/or Associated Transport, Inc. and/or any of its' [sic] or their divisions, and/or any subsidiary corporation, corporations or interests now existing or hereinafter created or acquired, or any of them or any combination of them . . . ."

However these words might be read in a different dispute, there is no doubt what they plainly mean in this one. The proceeds covered both companies. To be sure, upon draw down, Seaboard, in conformity with this agreement, held itself bound to refund to Chase those funds not used for both Eastern and Associated liabilities. But there can be no question on this record that the proceeds were destined for both Eastern and Associated liabilities.

The record is bereft of any evidence by which it can even be implied that the letter of credit was not issued as part and parcel of Eastern's program to assume the management of Associated. As seen in I, *supra*, the creditor banks in mid-1974 orchestrated the integration of a reasonably healthy Eastern with the perhaps terminally ill As-

---

**9.** "For consideration heretofore received, we hereby establish our irrevocable Letter of Credit in your favor for a sum, or sums, not exceeding a total of One Hundred Fifty Thousand Dollars ($150,000.00). Funds may be drawn hereunder by your drafts on us at sight.

The aforementioned funds are to be used and disbursed by S.D. Brull & Associates as supple-ment funds to complete the Camino Real Condominium, 105 S.W. 8th Street, Miami, Florida, and/or Cutler Club Condominium, 110th Court at S.W. 196th Street, Miami, Florida, if necessary. Our commitment under this Letter of Credit expires on October 31, 1974."

sociated. Chase nowhere disputes that the key economic motivation for the Eastern-Associated joint bonding program, facilitated by the $2 million collateral, was to induce Seaboard to surrender about $650,000 of Associated collateral, $500,000 of which was to immediately provide urgently needed cash for the newly installed management. The only suggested motivation for the issuance of the letter of credit was its status as replacement collateral acceptable to Seaboard.

Accordingly, by its own commitment, Seaboard is obligated to refund only those proceeds remaining after the joint Eastern-Associated liabilities have been discharged. It appears that Seaboard has already expended more than the $2 million.

D. THE TRUSTEE'S RIGHTS, IF ANY

or

IN THIS RACE HE BACKS THE WRONG HORSE

The trustee sought no positive relief. He tracked Chase's course but would interpose himself between Chase and the extent to which this court should conclude that less than $2 million was utilized by Seaboard only as to Eastern's liabilities. But, as the court has concluded that there are no remaining proceeds since Seaboard acted properly in applying the $2 million to the cargo liabilities of both bankrupts, the trustee's colors, like Chase's, are, in this dispute, left at the starting gate. Whatever action he or the other defendants who claim to be secured by the receivables said to have been set-off by Seaboard might have against Seaboard must await the next chapter in this epic.

Settle order on notice.