In re LANCASTER STEEL
CO., Inc., Debtor.

Barclay's Bank PLC, Appellant,

v.

Dresdner Bank Lateinamerika
A.G., Appellee.

Bankruptcy No. 98–24711–BKC–PGH.
Adversary No. 99–2226–BKS–PGH.

United States District Court,
S.D. Florida.

July 15, 2002.

Order denying rehearing Sept. 3, 2002.

154

Edward Maurice Mullins, Gregory Stewart Grossman, Astigarraga, Davis, Mullins & Grossman, Miami, FL, for Barclays Bank, PLC.

Gary Michael Carman, Broad & Cassel, Miami, FL, for Dresdner Bank Lateinamerika, AG, fka Deutsch–Suedamerikanische Bank, AG.

### ORDER REVERSING BANKRUPTCY COURT'S ORDER GRANTING SUMMARY JUDGMENT

HURLEY, District Judge.

**THIS CAUSE** comes before the court upon appellant Barclays Bank's appeal of the bankruptcy court's order entering summary judgment in favor of the appellee, Dresdner Bank, stating that certain "excess" funds drawn down by a beneficiary of a letter of credit are the property of Dresdner, and not the bankruptcy estate. Upon review of the appellate briefs, relevant case law, and argument of counsel, this court will reverse the bankruptcy court's order and remand for further proceedings.

### BACKGROUND

This appeal arises from the *Findings of Fact and Conclusions of Law,* dated November 26, 2001, an order entering summary judgment in favor of Dresdner Bank Lateinamerika AG ("appellee"), dated November 26, 2001, and the order denying Barclays Bank PLC ("appellant")'s motion for rehearing, dated December 28, 2001, entered by the United States Bankruptcy Court for the Southern District of Florida (Larry Lessen, U.S. Bankruptcy Judge). These orders relate to the underlying Chapter 11 bankruptcy proceeding *In Re Lancaster Steel Co., Inc.,* Case No. 98–24711–BKC–PGH and adversary proceeding *Dresdner Bank Lateinamerika AG v. Lancaster Steel Co., Inc.,* Adv. No. 99–2226–BKC–PGH–A. Barclays filed a notice of appeal of those subject orders on January 4, 2002.

Lancaster Steel Company ("Debtor") was engaged in the business of supplying construction equipment and supplies. Barclays Bank ("appellant") was the debtor's primary lender and a secured creditor. In September 1995, Los Amigos ("beneficiary") entered into an agreement with Lancaster Steel and ABB Power Generation Ltd. for the construction of an electric plant ("TEBSA contract") in Colombia. Appellant's App. 9. Under that contract, Lancaster would supply services and equipment to Los Amigos, and Los Amigos would pay Lancaster for those services in a series of milestone or progress payments. The total amount of payment from

Los Amigos to Lancaster for the work done under the contract was $67,775,000.

The contract provided that Lancaster could send invoices to Los Amigos, but Los Amigos could hold back ten percent (10%) of each milestone payment due and owing to Lancaster as "retainage" to ensure that Lancaster would perform all of the work satisfactorily. Alternatively, Lancaster could provide a standby letter of credit (LC) that Los Amigos could draw upon under certain specified circumstances. Once Lancaster obtained the letter of credit, Los Amigos would release the cash retainage it held and give it to Lancaster. From October 1995 to October 1996, Lancaster sent invoices to Los Amigos, and Los Amigos made payments on those invoices but withheld cash in an amount equal to ten percent of the amount of the invoices.

In 1996, Lancaster approached Dresdner to issue a standby letter of credit. Dresdner agreed. In exchange for posting the letter of credit, Dresdner required Lancaster to sign a letter of credit agreement in which Debtor became obligated to repay Dresdner for the loan obligation that would be created if Los Amigos were to draw on the letter of credit. Lancaster would be required, once the draw was made, to provide collateral to Dresdner in the form of a time-deposit account in an amount equal to two-thirds of the amount drawn. Moreover, Dresdner was permitted to use the collateral to repay any obligation—not only the LC between itself and Lancaster.

The language of the LC was negotiated among Lancaster, Dresdner, and Los Amigos. Appellant's App. 14. It provided that Los Amigos could draw upon the LC if it presented to Dresdner a sight draft and a certificate of drawing containing certain statements. The LC provided that it would be governed by the Uniform Customs and Practice for Documentary Credits Publication 500 ("UCP") and New York law. It also contained a merger/integration clause.

In 1996, Dresdner issued the LC for a 1.5% fee. Los Amigos then remitted the cash retainage it held to Lancaster, and Lancaster placed two-thirds of those funds in the time deposit pledged to Dresdner. In 1997, Lancaster paid another 1.5% issuance fee, and Dresdner renewed the LC. On May 19, 1998, Dresdner applied the time-deposit funds (at that time, $2.26 million) against one of Lancaster's loans with Dresdner, unrelated to the LC, which had not yet been drawn upon.

On July 7, 1998, an involuntary bankruptcy petition was filed against Lancaster. Lancaster consented to an order of relief under Chapter 11, and continued to perform its obligations under the TEBSA contract. On March 1, 1999, Dresdner filed its proof of claim against the bankruptcy estate, and listed the LC as a contingent exposure.

The LC was nearing its expiration date. On August 27, 1998, Dresdner advised Los Amigos that it would not extend the LC. In September 1998, Los Amigos presented the LC and certificate of drawing to Dresdner for payment. As required, Los Amigos stated that (1) the amount requested in the sight draft was available under the LC, (2) final acceptance under the TEBSA contract had not occurred and the LC was set to expire within 30 days, and (3) the LC had not been extended.

Dresdner initially refused to honor the draw. On September 18, 1998, Dresdner filed an emergency petition with the bankruptcy court regarding the LC. The bankruptcy court ruled that it did not have jurisdiction over the LC itself or the requested draw, but permitted Dresdner to attempt to extend the LC. Los Amigos

refused to accept an extension. Subsequently, on October 1, 1998, Los Amigos sued Dresdner for failing to honor the LC. Dresdner finally honored the LC, and sent $3,344,450 to Los Amigos pursuant to the draw certificate.

In November 1998, Lancaster and Los Amigos reviewed the status of the project and enumerated a set of tasks Lancaster was required to perform under the TEBSA contract (the "punch list"). After the punch list was created, Los Amigos did not dispute that it was obligated to pay the retainage to Lancaster, but the parties disputed the amount and obligation to pay interest on the funds. At this time, the punch list of tasks to be completed by Lancaster totaled $79,000.00.

In March 1999, Lancaster moved to approve a settlement with Los Amigos, where Los Amigos agreed, in accordance with the TEBSA contract, to pay Lancaster $3.335 million, including accrued interest, in exchange for the bankruptcy estate's release of Los Amigos from further obligations. On June 10, 1999, the bankruptcy court approved the settlement and ordered the TEBSA funds placed into escrow on the condition that all then-existing liens, encumbrances, and competing claims to the funds would survive the transfer to the escrow account. In the settlement, Los Amigos released $159,000 that was kept as retainage for the punch list.

Lancaster acknowledges that is has received full payment under the TEBSA agreement, and there are no retainage payments due and owing to Lancaster by Los Amigos. It is undisputed that Lancaster has *not* reimbursed Dresdner for the payment of monies due to Dresdner as a result of Los Amigos's drawing down of the letter of credit. The dispute over funds traceable to the LC proceeds, therefore, is between Dresdner and Barclays, as a central secured creditor.

On June 28, 1999, Dresdner brought this adversary proceeding against Debtor, pursuing claims for declaratory relief, subrogation under 11 U.S.C. § 509(a) or equitable subrogation, and unjust enrichment. On July 30, 1999, Debtor counterclaimed against Dresdner and Barclays and others, requesting the bankruptcy court determine the rights to the TEBSA funds. On December 13, 1999, Barclays moved for partial summary judgment on the ground that the funds were property of the Debtor's estate. On January 24, 2000, Judge Larry Lessen heard argument on the motion, and continued the trial that had been set.

On June 12, 2000, the bankruptcy court *sua sponte* entered summary judgment against Barclays. Barclays appealed. On December 20, 2000, the Honorable William J. Zloch, Chief United States District Judge, vacated the bankruptcy court's order on the ground that the trial court did not give proper notice to Barclays that it would enter summary judgment against it, and remanded for further proceedings. Appellant's App. 33.

On April 23, 2001, the bankruptcy court held a hearing on the *sua sponte* motion for summary judgment. On November 26, 2001, the bankruptcy court entered an order and supporting findings of fact and conclusions of law granting summary judgment against Barclays. On December 16, 2001, Barclays moved for a rehearing. On December 28, 2001, the bankruptcy court summarily denied the motion. Barclays appeals.

### JURISDICTION

The federal district courts have jurisdiction over appeals from final judgments, orders, and decisions in bankruptcy, pursuant to 28 U.S.C. § 158(a). The bankruptcy courts have subject matter jurisdiction based on 28 U.S.C. § 157(b).

## DISCUSSION

### A. STANDARD OF REVIEW

■ Under Fed.R.Civ.P. 56, incorporated into bankruptcy adversary proceedings pursuant to Fed.R.Bankr.P. 7056, "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This court reviews the bankruptcy court's conclusions of law *de novo. See In re Chase & Sanborn Corp.,* 904 F.2d 588, 593 (11th Cir.1990).

■ The bankruptcy court's findings of fact are upheld unless they are clearly erroneous. *See In re Chase,* 904 F.2d at 588. The district court is not authorized to make independent factual findings, as that is the function of the bankruptcy court. *See In re Sublett,* 895 F.2d 1381, 1384 (11th Cir.1990). The bankruptcy court's evidentiary rulings are reviewed for abuse of discretion. *See Ad–Vantage Tel. Directory Consultants v. GTE Directories Corp.,* 37 F.3d 1460, 1463 (11th Cir. 1994). The bankruptcy court's equitable determinations are reviewed under an abuse of discretion standard. *See In re Red Carpet Corp. of Panama City Beach,* 902 F.2d 883, 890 (11th Cir.1990).

### B. APPELLANT'S CLAIMS

■ In its appeal, Barclays argues as follows: (1) the bankruptcy court erred in not granting summary judgment in favor of Barclays because the TEBSA funds were clearly property of the bankruptcy estate; (2) the court erred in failing to hold that once Dresdner paid Los Amigos, the beneficiary, it no longer had any interest in monies "traceable" to such payment; (3) the court erred in granting summary judgment in favor of Dresdner when Dresdner itself admitted that a portion of the TEBSA funds (approximately $159,000) were part of the estate; (4) the court erred in relying on disputed facts or facts not supported by evidence on the record; (5) the court erred in its balancing of the equities in the case; and (6) the court erred in granting summary judgment in favor of Dresdner when genuine issues of material fact remained to be determined.

The central dispute in this case is whether any funds drawn by Los Amigos pursuant to the LC that are in excess of the amount required to secure retainage (pursuant to the underlying contract between Lancaster and Los Amigos) is property of the issuer of the LC or Lancaster (and therefore the bankruptcy estate). Essentially it is a question of whether approximately $3.3 million in escrow will end up in the hands of the issuer of the LC or the central creditors of the bankruptcy estate, including Barclays.

Barclays asserts that the bankruptcy court essentially ignored principles of letter of credit law when it determined that the TEBSA funds were property of the issuer, and not the estate. The LC agreements were executed in 1996 and renewed in 1997—prior to the bankruptcy petition—but Los Amigos, as a beneficiary, made a draw on the agreement after the petition. The LC agreement is governed by New York law.

■ Under New York law, "A letter of credit is a unique commercial vehicle designed to substitute the creditworthiness of a neutral party for that of a party interested in an underlying transaction and assure prompt payment of obligations." 4 N.Y.PRAC., COMMERCIAL LITIGATION IN NEW YORK STATE COURTS § 54.4. "The purpose of a letter of credit its to substitute for, and therefore support, an

engagement to pay money." *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 486 N.Y.S.2d 715, 475 N.E.2d 1255, 1258 (1985). Types of letters of credit include commercial letter of credit, standby letter of credit, and negotiation credit. There are a number of parties and relationships between each in a letter of credit transaction:

> The typical letter of credit transaction involves three separate relationships. First, there is the relationship between two parties that gives rise to the need for a letter of credit, whereby one party agrees to arrange for the other to be paid in the future. Second, there is the relationship between the party arranging for the letter of credit (referred to as the "account party") and its bank (the "issuer"), whereby the bank agrees to issue its letter of credit and the account party agrees to reimburse the issuer. Third, there is the letter of credit itself, which is a definite undertaking of the issuer to honor drafts or demands for payment of the party to be paid (the "beneficiary") presented in compliance with the terms and conditions of the letter of credit. Other banks are frequently involved in these transactions, interposing additional layers between the typical tripartite arrangement described above.

4 N.Y.PRAC., *supra*, § 54.4. Basically, the account party (in this case, Lancaster, the debtor) enters into an underlying contract with the beneficiary. The account party enters into a separate agreement with an issuer for the latter to issue a letter of credit. The beneficiary of the LC agreement is permitted, under specified conditions, to present certain documents in order to draw down a certain amount. Then, the account party is obligated to pay to the issuer a sum in the amount the beneficiary has drawn.

Moreover, each of the contractual relationships is independent of the others. "One of the most basic precepts of letter of credit law and practice is the principle of independence. . . . The concept is that each of these relationships is independent of the others, and the rights and obligations of the parties to one are not affected by the breach or non-performance of any of the other." *Id.* at § 54.5. "The account party's obligation to reimburse the issuer for its proper honor of demands for payment under the letter of credit is unaffected by disputes over performance of its contract with the beneficiary, and the account party must reimburse the issuer who paid on a proper demand even if the beneficiary breached the underlying contract." *Id.*

There are a number of policy considerations behind the independence principle. Chiefly, the principle facilitates the use of letters of credit to shift credit risk by relieving issuers and other banks from having to investigate the underlying transaction, and allow the financial intermediaries to ascertain their liability to pay on the instrument quickly and with minimal expense. "The independence principle is recognized as essential to the proper functioning and value of letters of credit." *Id.*

In *Mennen v. J.P. Morgan & Co.*, 91 N.Y.2d 13, 666 N.Y.S.2d 975, 689 N.E.2d 869, 875 (1997), the New York Court of Appeals, the state's highest court, reaffirmed the independence principle in letter of credit law. Significantly, the court stated that the principle barred an issuer from suing the beneficiaries for return of funds paid where the issuer's claims "inescapably flow from and implicate the separate, underlying contract" between the customer and the beneficiaries. "To give legal cognizance and effect to [the issuer's claims] would pierce the protective shield of the particular clauses and financial instru-

ments arranged by and among these sophisticated parties." *Id.*

 To determine the rights of the parties with respect to an LC transaction, the courts must look to the wording of the letter of credit itself. "A letter of credit is a wholly integrated agreement; application of general contract principles prohibit the use of extrinsic evidence to contradict or supplement its stated claims." *In re Whitney*, No. 4–88–3885, 1989 WL 112787, at *7 (Bankr.D.Minn. Sept.26, 1989). The *Whitney* court looked to the letter of credit, and stated that once the beneficiary received the payment, it became a fully executed contract. Since that letter of credit did not restrict what the beneficiary could do with those funds, the beneficiary was free to do with the proceeds as it wished, subject to any contracts it had with any other parties.

There are a number of cases purporting to stand for the proposition that "proceeds from a letter of credit are not part of the debtor's bankruptcy estate." Indeed, appellees recite that statement throughout their brief. *See In re Page*, 18 B.R. 713 (D.D.C.1982); *In re Zenith Labs., Inc.*, 104 B.R. 667 (Bankr.D.N.J.1989); *ITT Commercial Financial Corp. v. Bethel Marine, Inc.*, No. 3–87–3247, Adv. No. 3–88–37 (Bankr.D.Minn. Jun. 1, 1988 & Oct. 4, 1988) (unpublished opinion); *In re W.L. Mead, Inc.*, 42 B.R. 57 (Bankr.N.D.Ohio 1984); *In re Leisure Dynamics, Inc.*, 33 B.R. 171, 172–73 (Bankr.D.Minn.1983); *In re M.J. Sales & Distributing Co.*, 25 B.R. 608 (Bankr.S.D.N.Y.1982).

However, all of the cited cases merely reaffirm that notwithstanding the fact that the bank customer has gone into bankruptcy, a bank that, prior to the filing of the bankruptcy petition, has issued a letter of credit is required to fulfill its obligations under the letter of credit by paying the beneficiary upon request. The cases merely indicate that a bankruptcy debtor has no claim to any funds that an issuer pays to a beneficiary, and accordingly the court cannot enjoin the payment of the funds pursuant to the letter of credit.

In one case, *Bethel Marine*, the court determined that the issuer was entitled to the return of excess funds drawn post-petition by a beneficiary. However, the *Whitney* court distinguished the case by noting that in *Bethel Marine*, the issuer's letter of credit explicitly requested that the beneficiary certify that the amount it drew on the letter of credit did not exceed the amount it was actually owed. *Whitney*, 1989 WL 112787, at *9. The *Whitney* court indicated that the contract before it did not include any such restrictions.

 The case law on this subject emphasizes the independence principle—in interpreting the letter of credit, one does not look to the underlying agreement between the customer and the beneficiary that sparked the need for the letter of credit. In the present case, the letter of credit issued by Dresdner with Los Amigos as the beneficiary was clearly a separate contract from the contract for services between Lancaster (the Debtor) and Los Amigos. The letter of credit contains no language limiting the amount of funds that Los Amigos can draw down at any one time, prior to the expiration of the LC.

While Dresdner continually recites the mantra that "proceeds of the letter of credit are not part of the debtor's bankruptcy estate," that statement is neither remarkable nor relevant to this case. All that means is that a debtor in bankruptcy cannot claim letters of credit issued on its behalf as assets of the bankruptcy estate. While the $3.3 million that Los Amigos sought to give to Lancaster was traceable to the letter of credit funds, the funds were not, technically speaking, "proceeds

of the letter of credit." Once Dresdner performed under the letter of credit and gave the funds to Los Amigos, all obligations under the letter of credit were satisfied. Dresdner can only look to Lancaster for repayment under the letter of credit agreement—and therefore Dresdner must be treated like any other creditor. In addition, the fact that Los Amigos disclaims any right to the TEBSA funds is not relevant to the issue of whether the funds belong to the bankruptcy estate.

In the order entering summary judgment against Barclays, the bankruptcy court noted that at the time the bankruptcy petition was filed, Los Amigos had already paid Lancaster $67,426,600.49, almost the full amount owed under the TEBSA agreement, and the standby letter of credit was not drawn down until after the bankruptcy case commenced. The court concluded that "the LC proceeds are not due to the Debtor and the standby letter of credit does not involve monies of the estate as defined by 11 U.S.C. § 541; rather, it involves monies of the issuer, Dresdner." Appellant's App. 41.

 The bankruptcy court viewed the TEBSA funds as "proceeds of the letter of credit" that ought to be remitted to the issuer, in contravention to well-settled New York letter of credit law—in particular, the independence principle. Oddly, Dresdner cites the independence principle in its brief, but proceeds to violate that principle by asking the court to look to the underlying agreement to support its argument that Los Amigos drew down too much money, and therefore the issuing bank was entitled to the "unneeded surplus." The language of the LC did not purport to govern what Los Amigos could do with any funds that were drawn down. "Mere general references to underlying agreements are surplusage and are not to be considered in deciding whether the ben-

eficiary has complied with the terms of the credit. It is only the most insistently clear language that will permit a court to deviate from this rule." *In re Eastern Freight Ways, Inc.,* 9 B.R. 653, 663 (Bankr. S.D.N.Y.1981). Also, "[t]he beneficiary's use of and right to retain the proceeds was governed, not by anything in the respective letters of credit, but by its agreement with the account party." *Id.* Accordingly, to the extent that the bankruptcy court relied on substantive law to justify its awarding of the TEBSA funds to Dresdner, the bankruptcy court erred.

However, it appears that the bankruptcy court relied on unspecified principles of equity in entering judgment against Barclays. The bankruptcy court noted that it was a court of equity, and therefore possessed power to afford fair and equitable treatment to parties in particular situations. The bankruptcy court stated that "[g]ranting Barclays an interest in the LC Proceeds based upon its perfected security interests against Debtor's property, where Debtor had already been paid all amounts owed by Los Amigos, would result in unjust enrichment to Barclays. Where a party is unjustly enriched, a court sitting in equity may impose a constructive trust under the 'equity and good conscience rule.' ... Because Debtor, through its counsel, holds these LC proceeds under circumstances that in equity and good conscience it ought not to retain them, it must return them to Dresdner." Appellant's App. 41 at 8–9.

 We recognize that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). *See also In re Empire for Him, Inc.,* 1 F.3d 1156, 1160 (11th Cir.1993). Bankruptcy courts have relied on equitable principles in "those areas fall-

ing within the interstices of the [Bankruptcy] Act; one such area being the proper disposition of the surplus." *Matter of First Colonial Corp. of America*, 693 F.2d 447, 450–51 (5th Cir.1982). The Bankruptcy Code also contains provisions expressly authorizing bankruptcy courts to exercise certain equitable powers, such as the power to subordinate the claims of creditors who engaged in inequitable conduct. *See In re Southeast Banking Corp.*, 156 F.3d 1114, 1122 (11th Cir.1998). However, the Supreme Court has noted that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). "The statutory language of the Bankruptcy Code should not be trumped by generalized equitable pronouncements, especially when Congress has been explicit when it intends for courts to exercise equitable discretion in the bankruptcy arena." *In re Welzel,* 275 F.3d 1308, 1318 (11th Cir.2001).

However, the record contains no evidence of grounds for an imposition of a constructive trust on the TEBSA funds. Neither Lancaster nor Los Amigos owed any fiduciary duties to Dresdner, a sophisticated party with whom Lancaster dealt at arms' length. The case law emphasizes that the parties to the letter of credit are, more often than not, sophisticated parties. Dresdner could have included language that limited the amount of funds available under the letter of credit, or specified that Los Amigos could only draw an amount that it reasonably knew was needed to secure performance by Lancaster, or contracted for additional collateral. It did none of these things. Courts have declined to use equity to grant rights to an LC issuer where the issuer could have contracted for those rights. *See, e.g., In re Carley Capital Group,* 119 B.R. 646, 650

(W.D.Wis.1990) ("[T]here is no equitable reason to grant such additional rights to the plaintiffs in this case since they could have achieved the same protection by contract."). *See also Briggs v. Goodyear Tire & Rubber Co.,* 79 F.Supp.2d 228, 237 (W.D.N.Y.1999) ("Settled law indicates that the equitable claims of unjust enrichment and constructive trust are unavailable where plaintiffs have rights under a valid and enforceable contract.").

There is no bar to Dresdner's filing a claim against Lancaster for the amount of the LC. Similarly, there is no bar to Dresdner's suing Los Amigos or Lancaster for fraud; however, there is no indication that Dresdner's letter of credit was procured by fraud, or that Los Amigos fraudulently drew the funds, or that Los Amigos drew more money than was permitted under the LC. In fact, Dresdner states in its brief that "Dresdner does not maintain that Los Amigos did not have the right to draw the full $3,334,450.00. Nor does Dresdner allege, as did the bank in *Mennen,* that an underlying contract precluded Los Amigos, the beneficiary, from making the full withdrawal." Appellee Br. 25. Moreover, there is no evidence in the record tending to support the bankruptcy court's conclusion that equity required that Dresdner be treated as a preferred creditor in the bankruptcy proceeding.

Undoubtedly, the bankruptcy court and Dresdner were troubled by the fact that Los Amigos, realizing that Lancaster was in bankruptcy proceedings, ran out to draw down the LC to the limit, even though under the terms of the underlying TEBSA contract, the amount left to be paid to Lancaster was a mere fraction of the funds drawn. But it is important to note that at the time of the draw-down, final acceptance under the TEBSA contract had not yet occurred. In all likeli-

hood, Los Amigos was aware that Lancaster was in bankruptcy, and the LC issued by Dresdner was about to expire. Los Amigos probably sought to take possession of the full amount of the LC proceeds to which it was entitled in order to protect itself if, prior to final acceptance, it was discovered that Lancaster's work had been deficient, or Lancaster had caused damages to the project.

For example, while Los Amigos may have made virtually full payment to Lancaster under the TEBSA agreement, an inspection prior to final acceptance might have revealed that Lancaster's work had caused $3 million in damage. Los Amigos's recourse would have been to look to the LC funds, or file another claim against the debtor in bankruptcy court, where full recovery would have been less likely. It cannot be said that Los Amigos's action to protect itself, by drawing down the entire $3.3 million available under the LC, was unreasonable (or fraudulent) in relation to a $67.8 million contract.

In sum, the bankruptcy court erred when it looked to the underlying TEBSA contract, in violation of the independence principle, to conclude that the difference between the amount Los Amigos drew down on the LC and the amount left to be paid to Lancaster was "surplus" funds that ought to be remitted to Dresdner. Under the TEBSA contract, the excess funds from the LC constituted retainage properly returnable to the Debtor. Accordingly, the TEBSA funds would be part of the bankruptcy estate. Moreover, in the absence of any evidence tending to indicate fraudulent or other inequitable conduct on the part of Lancaster or Los Amigos, no grounds have been shown for the bankruptcy court to impose a constructive trust in favor of Dresdner on the excess TEBSA funds that were traceable to the LC. While there may be grounds for the bankruptcy court to impose such a constructive trust, the bankruptcy court must make specific findings that such extraordinary relief is warranted.

## CONCLUSION

The bankruptcy court's *sua sponte* entry of summary judgment against Barclays is **REVERSED,** and the case is **REMANDED** for further proceedings not inconsistent with this opinion.