In re SPRING FORD INDUS., INC. a/k/a Spring Ford Knitting Co., Inc., Debtor.

PNC Bank, Nat'l Assoc., Plaintiff/Appellant,

v.

In re Spring Ford Indus., Inc. a/k/a Spring Ford Knitting Co., Inc., Defendant/Appellee.

Bankruptcy No. 02–1501 DWS. Adversary No. 04–0479. Civ.A. No. 05–2549.

United States District Court, E.D. Pennsylvania.

Feb. 2, 2006.

James W. Hennessey, Dilworth Paxson LLP, Philadelphia, PA, for Plaintiff.

David P. Adams, Philadelphia, PA, pro se.

Frank S. Marinas, Paul Brinton Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, Camille Spinale, Lead Attorney, Philadelphia, PA, J. Larry Stine, Lead Attorney, Atlanta, GA, Todd C. Brockmann, Lead Attorney, Charlotte, NC, for Debtor/Defendant.

## MEMORANDUM AND ORDER

PRATTER, District Judge.

Plaintiff/Appellant PNC Bank, National Association appeals the Bankruptcy Court's decision denying its motion for summary judgment in this adversary proceeding. The parties have briefed the issues and presented compelling oral argument. Both parties' written and oral presentations are a credit to their respective clients. For the reasons set forth below, the Bankruptcy Court's denial of PNC's summary judgment motion and granting Spring Ford's motion for summary judgment is affirmed.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. BACKGROUND

On April 2, 2002, Spring Ford Industries, Inc. a/k/a Spring Ford Knitting Co., Inc. ("Spring Ford") filed a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code. Spring Ford was a debtor-in-possession until December 6, 2002, when the plan of reorganization confirmed by the Bankruptcy Court became effective.

While in business, Spring Ford was an authorized self-insurer for workers' compensation purposes pursuant to the Pennsylvania Workers' Compensation Act, 77 P.S. §§ 1–2626. As a self-insurer, Spring Ford paid its employees' workers' compensation claims rather than obtaining private or state-sponsored insurance. *See In re Sacred Heart Hospital,* 212 B.R. 467, 470 (E.D.Pa.1997) (explaining operation of employer self-insurance). As a condition of the self-insured status, the Bureau of Worker's Compensation of the Department of Labor and Industry (the "Bureau") required Spring Ford to post security in the amount of $1,000,000 for the payment of its workers' compensation liability. *See* 77 P.S. § 501(a)(2). Spring Ford chose to meet its security obligation through an irrevocable letter of credit. The Bureau sent Spring Ford instructions, including the language for the irrevocable letter of credit, stating that "[n]o deviation from this language is permitted." The instructions also provided the language for a "Funding Trust Agreement which will also

serve as the trust for the Deposit of Letter of Credit Proceeds."

On January 10, 1994, PNC issued the letter of credit in the amount of $1,000,000 on behalf of Spring Ford, naming the Bureau as the beneficiary (the "Letter of Credit").[1] The Letter of Credit provided that it would be honored upon presentment by the Bureau, without any further conditions on the Bureau's ability to draw down on the line of credit. At the direction of the Bureau, Spring Ford also executed a document titled "Acknowledgment of Terms and Conditions on Posting Letters of Credit" (the "Acknowledgment"). The Acknowledgment provides a list of circumstances under which the Bureau may draw on the letter of credit, including the circumstance of the Bureau being notified that the Letter of Credit will not be renewed.

On January 11, 1994, PNC and Spring Ford entered into an agreement titled "Irrevocable Agreement of Trust for the Payment of Workers' Compensation by Self–Insurer" (the "Trust Agreement"), with PNC named as the trustee and the Bureau named as the beneficiary. The Trust Agreement provided that "the trust fund is established to provide a source of funds and to maintain adequate reserves for the payment of workers' compensation claims." Section 2(e) of the Trust Agreement provided that the Bureau could direct "proceeds from security posted by [Spring Ford] to secure its Claims Liability, such as . . . letters of credit, be deposited into a

segregated account that is part of the Trust Fund."

On March 25, 2002, the Bureau, evidently after learning that PNC would not renew the Letter of Credit, drew on the Letter of Credit to its full extent of $1,000,000 and directed PNC to transfer the funds. Pursuant to section 2(e) of the Trust Agreement, the Bureau deposited the proceeds from the Letter of Credit (the "Letter Proceeds") into a segregated part of the Trust Fund.

Spring Ford filed a voluntary petition for reorganization on April 2, 2002. PNC filed, and the Bankruptcy Court allowed, a $1,000,000 unsecured claim against Spring Ford's bankruptcy estate.[2] PNC has received distributions from the bankruptcy estate on its claim totaling $528,890.08, or approximately 52.8% of its claim.[3] (Tr. at 27).

The Bureau has paid all outstanding workers' compensation claims and expenses, leaving an unneeded excess of approximately $440,000 (the "Excess"). (App. I, Tab 17, Ex. B). The Bureau has since transferred the Excess to an escrow account at United Savings Bank pending the outcome of this dispute. (App. I, Tab 17, Ex. B). On May 4, 2004, PNC filed an adversary proceeding against Spring Ford and the Bureau, alleging that it was entitled to any funds held by the Bureau in excess of Spring Ford's actual workers' compensation liabilities because the Ex-

---

1. The parties agree that there were at least two amendments to the original Letter of Credit, including renumbering the Letter of Credit's reference number and a change in the automatic extension provisions. Neither of the amendments are relevant here.

2. PNC also filed a second proof of claim for interest in the amount of $491.67, plus per-diem interest in the amount of $131.94, all of which the Bankruptcy Court disallowed.

3. At oral argument, counsel for Spring Ford informed the Court that there had been another general distribution to the creditors during the pendency of PNC's appeal, but PNC did not receive a distribution because of the appeal. (Tr. at 28–29). Counsel for Spring Ford stated that this distribution would have increased PNC's recovery to approximately 62% of its original claim.

cess is not property of the bankruptcy estate,[4] a conclusion that Spring Ford disputes, i.e., Spring Ford contends the estate does have a property interest in the excess.

Spring Ford and PNC filed cross motions for summary judgment in the adversary proceeding. On April 19, 2005, the Bankruptcy Court issued an opinion denying PNC's motion and granting summary judgment in favor of Spring Ford. *See In re Spring Ford Indus., Inc.,* Nos. 02–15015DWS, 04–479, 2005 WL 984180, 2005 Bankr.LEXIS 730 (Bankr.E.D.Pa. Apr. 19, 2005)(Sigmund, C.J.).

## B. BANKRUPTCY COURT'S RULING

The Bankruptcy Court found that the Bureau, under the Letter of Credit, had the right to draw down to the full extent of the Letter of Credit, which it opted to do. *Id.,* 2005 WL 984180 at *2, 2005 Bankr.LEXIS 730 at *6. The Bankruptcy Court also found that, once the Bureau drew on the Letter of Credit, PNC had performed under the Letter of Credit and that contract was fully executed, with all obligations being satisfied. *Id.,* 2005 WL 984180 at *2, 2005 Bankr.LEXIS 730 at *6. The Bankruptcy Court concluded that the Bureau was entitled to do whatever it wanted with the Letter Proceeds, subject to any other contracts or statutory restrictions that might bind it, and that the Bureau chose to deposit the funds into a segregated account in the Trust Fund, which, under the terms of the Trust Agreement, it was entitled to do. *Id.,* 2005 WL 984180 at *2, 2005 Bankr.LEXIS 730 at *6.

The Bankruptcy Court examined the Trust Agreement to determine the rights of Spring Ford and PNC in the Trust Fund where the money was deposited. *Id.,* 2005 WL 984180 at *1, 2005 Bankr.LEXIS 730 at *4. The Bankruptcy Court found that Section 19 of the Trust Agreement, titled "Rights to Trust Fund," gave no rights to PNC, except as contemplated under the Pennsylvania Workers' Compensation Act and the Pennsylvania Occupational Disease Act (the "Acts"). *Id.,* 2005 WL 984180 at *1, 2005 Bankr.LEXIS 730 at *4. The Bankruptcy Court noted that PNC had not cited to any provision in either of the Acts that supported its claim to the Excess. *Id.,* 2005 WL 984180 at *1, 2005 Bankr.LEXIS 730 at *4. The Bankruptcy Court found, however, that Section 19 granted Spring Ford rights of reversion as provided under Sections 2(e), 13, and 14 of the Trust Agreement. *Id.,* 2005 WL 984180 at *1, 2005 Bankr.LEXIS 730 at *4. The Bankruptcy Court examined these sections and concluded that they gave all reversionary interests to Spring Ford. *Id.,* 2005 WL 984180 at *1, 2005 Bankr.LEXIS 730 at *4. The Bankruptcy Court held that reversionary rights are part of a bankruptcy estate, and, thus, that the Excess is property of the estate not to be returned to PNC. *Id.,* 2005 WL 984180 at *1–2, 2005 Bankr.LEXIS 730 at *5.

## II. DISCUSSION

### A. JURISDICTION AND STANDARD OF REVIEW

█ This Court has jurisdiction over PNC's appeal pursuant to 28 U.S.C. § 158(a)(1) and Rule 8001 of the Federal Rules of Bankruptcy Procedure. On appeal, the District Court conducts a *de novo* review of the Bankruptcy Court's conclusions of law and applies a clearly erroneous standard to the findings of facts. *See*

---

**4.** PNC voluntarily dismissed the Adversary Complaint against the Bureau with prejudice pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.,* 142 F.3d 631, 635 (3d Cir. 1998).

Summary judgment standards under Rule 56 of the Federal Rules of Civil Procedure are made applicable to bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions ... which it believes demonstrate an absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

To defeat a motion for summary judgment, factual disputes must be both material and genuine. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "material" if it is predicated upon facts that are relevant and necessary and that may affect the outcome of the matter pursuant to the underlying law. *Id.* An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving parties. *Id.* at 248–49, 106 S.Ct. 2505. If there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Here, with cross motions for summary judgment, the parties essentially agree that the material facts are undisputed. Their dispute concerns the legal conclusions that can or should be drawn from those facts.

## B. THE EXCESS IS PROPERTY OF THE ESTATE

■ The commencement of a bankruptcy case creates a bankruptcy estate consisting, *inter alia,* of all legal or equitable interests of the debtor in property as of the commencement of the case. *See* 11 U.S.C. § 541(a)(1); *In re Triangle Laboratories, Inc.,* 663 F.2d 463, 466 n. 4 (3d Cir.1981). Many courts agree that Section 541(a)'s definition of "property" is broad enough to encompass reversionary interests. *See e.g., In re Wray,* 258 B.R. 777, 785 n. 8 (Bankr.D.Idaho 2001) (finding reversionary interest in real estate property of bankruptcy estate); *In re Hernando Healthcare, Inc.,* 157 B.R. 701, 703–04 (Bankr.M.D.Fla.1993) (finding reversionary interest in reserve fund to be part of bankruptcy estate). *See also In re Labrum & Doak,* 227 B.R. 391, 405 (Bankr. E.D.Pa.1998) ("[P]roperty of the estate includes all legal and equitable interests of the debtor in property ... 'the term property has been construed most generously and an interest is not outside its reach because it is novel ... in fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541;'" *quoting Carlson v. Brandt,* 1997 WL 534500, *7, 1997 U.S. Dist. LEXIS 12821, *28 (N.D.Ill. Aug. 22, 1997)).

■ At issue here are a letter of credit and its proceeds. A letter of credit is "an engagement by an issuer, usually a bank, made at the request of a customer for a fee, to honor a beneficiary's drafts or other demands for payment upon satisfaction of the conditions set forth in the letter

of credit." *Tudor Dev. Group, Inc. v. United States Fid. & Guar. Co.*, 968 F.2d 357, 360 (3d Cir.1992). "The salient feature of a letter of credit and the principal reason for its use in commercial transactions is the 'independence principle.'" *Id.* The independence principle provides that the letter of credit is completely separate from the underlying contract between the customer and the beneficiary. *Id.*

[■■■■] Under the independence principle, letters of credit and their proceeds are not part of the bankruptcy estate because the issuing bank distributes its own assets under the letter of credit and not the assets of the debtor/customer who caused the letter of credit to be issued. *See In re Metro Communications, Inc.*, 115 B.R. 849, 854 (Bankr.W.D.Pa.1990) (holding payments made to creditors pursuant to letters of credit could not be avoided as preferential transfers; letters of credit and proceeds not part of bankruptcy estate). The sole duty of the issuer of the letter of credit is ministerial, namely, the issuer has to determine if the beneficiary has properly complied with the conditions in the letter of credit. Once the beneficiary fulfills the requirements of the letter of credit and draws on it, the issuer of the letter of credit cannot direct how the beneficiary uses the proceeds. *See In re Eastern Freight Ways, Inc.*, 9 B.R. 653, 662 (Bankr.S.D.N.Y.1981) ("The provisions of the letter of credit deal[ ] with the mechanics for draw down and not with the purpose for which the proceeds were made available. This aspect is dealt with by the underlying agreement between the beneficiary ... and the [party causing the letter of credit to be issued.]"); *see also In re Whitney*, Nos. 4–88–3885, 4–89–35, 1989 WL 112787, at *9 (Bankr.D.Minn. Sept. 26, 1989). After the issuer pays the funds to the beneficiary, the letter of credit is a fully executed contract, and the issuer

must look to its customer for repayment—just as would any other creditor. *See In re Eastern Freight Ways, Inc.*, 9 B.R. at 662; *In re Lancaster Steel Co.*, 284 B.R. 152, 160 (S.D.Fla.2002).

PNC argues here that the excess funds that remained in the Trust after the Bureau paid the outstanding workers' compensation claims should be characterized as "proceeds" from the Letter of Credit and not be considered part of the bankruptcy estate. Thus, PNC asserts that the Bankruptcy Court erred when it determined that, because the proceeds were placed in the Trust Fund, the general rule that letters of credit and their proceeds are not property of the estate was inapplicable. PNC argues that the fact that the proceeds were placed into a trust does not matter because such funds will always be proceeds of the letter of credit. According to PNC, how the proceeds of the letter of credit are utilized does not make them any less proceeds from a letter of credit. PNC contends that because the proceeds of the letter of credit cannot be part of Spring Ford's bankruptcy estate they must be returned to PNC.

Spring Ford argues that the excess funds are not a letter of credit or its proceeds at all. Spring Ford asserts that once the Bureau demanded that PNC pay it the funds from the letter of credit—and once PNC paid the $1,000,000 to the Bureau—the letter of credit contract between PNC and the Bureau was fully performed and executed. Spring Ford argues that once those obligations were satisfied, the Bureau was free to do with the proceeds as it wished. In accordance with the Acknowledgment, the Bureau chose to place those proceeds into the Trust Fund, which is governed by the Trust Agreement. Spring Ford contends that, under the terms of the Trust Agreement, it has reversionary interests in any excess funds,

and PNC has no such interest in the assets.

Under the independence principle, the Letter of Credit is independent from the Trust Agreement. In accordance with the terms of the Letter of Credit, the Bureau called for payment of the entire amount allowed. There were no restrictions on its draw. The Letter of Credit did not condition the granting of the funds on the return or other constrained treatment of the Excess. Likewise, it did not dictate how the Bureau was to spend the proceeds. Once PNC honored the Letter of Credit, that contract between it and the Bureau was fulfilled. *In re Eastern Freight Ways, Inc.,* 9 B.R. at 662. The Bureau deposited the funds into the Trust, and it is the Trust Agreement that dictates the precise way the funds are supposed to be used. Thus, because PNC cannot control the use of the funds after it performs under the Letter of Credit, the only vehicle that could transport the "excess funds" back to PNC is the Trust Agreement, but only if it grants to PNC such an interest.

## C. INTERPRETATION OF THE TRUST AGREEMENT

[] Contracts must be interpreted as a whole, with effect given to all provisions if at all reasonably possible. *See Williams v. Metzler,* 132 F.3d 937, 947 (3d Cir.1997) (citing Restatement (Second) of Contracts § 202(2)). Any " 'ambiguous subsidiary contractual provision must be given an interpretation consistent with the dominant purpose of the contract.' " *Id.* at 947 (quoting *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City,* 674 F.2d 1001, 1009 (3d Cir.1982)).

[] PNC argues that the Trust Agreement provides Spring Ford with a reversionary interest only in the funds Spring Ford contributed to the Trust and not the proceeds of the Letter of Credit. Conversely, Spring Ford argues that the Bankruptcy Court correctly concluded that Spring Ford does have a reversionary interest in the excess, and that PNC has no such interest.

Section 19, titled "Rights to the Trust Fund," is the relevant provision of the Trust Agreement to commence the analysis of the parties' rights:

> It is understood and agreed that no person or corporation, except the parties hereto, shall have any rights under this Agreement or in the Trust Principal except as provided in this Agreement. The Trust Fund shall not be subject to any direct action or seizure by any creditor or claimant of the employer under any writ or proceeding at law or equity except as contemplated by and under the Acts. The Employer shall not have right, title, interest, claim or demand whatsoever in or to the Trust Principal other than the right to a proper application and accounting of it by the Trustee and the right of a reversion as provided under sections 2(e), 13 and 14(c), all as set forth in this agreement.

Section 1 of the Trust Agreement defines "Trust Principal" as "[a]ll assets of the Trust Fund established by this Agreement including cash and all Authorized Investments held by the Trustee in trust under this Agreement."

Here, PNC is a creditor or claimant of the employer, Spring Ford, because Spring Ford is liable to PNC for the amount that the Bureau drew on the Letter of Credit. *In re Lancaster Steel Co.,* 284 B.R. 152, 160 (S.D.Fla.2002). Under the plain language of Section 19, PNC only has rights to the Trust as provided under the "Acts." [5] PNC has not provided the

---

5. The "Acts" are defined in the Trust Agree- ment as the "Workers' Compensation Act (77

Court with any evidence of, or authority outlining, a cause of action under the Acts, nor has it effectively argued that it has such a claim.

Section 19, however, does give Spring Ford the right to a reversion of Trust Principal as provided under Sections 2(e), 13, and 14. Section 2(e) provides, in relevant part, that "if the Bureau determines that the proceeds from the security are no longer needed, the Bureau may direct that any remaining such security be distributed as directed by the Bureau."[6] Reading Sections 19 and 2(e) together, and giving effect to both provisions, "Trust Principal" includes the proceeds from the Letter of Credit, because, otherwise, the mention of Spring Ford's reversionary interest in the Trust Principal in Section 2(e) and in Section 19 would have no meaning.[7] While the words "distributed as directed" do not evince a "reversionary interest," which generally indicates an automatic operation by law or contract, the Court finds that, reading the contract as a whole and giving effect to all provisions, Spring Ford has a reversionary interest in the excess security remaining after the Bureau determines that the funds are no longer needed to pay workers' compensation claims.[8]

In addition, as noted by the Bankruptcy Court, Spring Ford also has a reversionary interest in "Trust Principal" pursuant to Sections 13 and 14 of the Trust Agreement. Section 13, titled "Irrevocability," provides for the distribution of the Trust Principal after the Agreement is terminated and all claims are paid, and states that, "any trust principal still held shall be returned to the Employer by the Trustee following receipt of notification from the Director of the Bureau that this Agreement has been terminated." Moreover, Section 14(c) of the Trust Agreement, titled "Termination of Self–Insurance," provides:

> If at any time after the termination of the Employer's self-insurance status the fair market value of the Trust Principal exceeds 110% of the outstanding Claims Liability, the Employer may request permission from the Director of the Bureau to release the excess Trust Principal to it. The request must be supported by a report prepared by an Actuary certifying the value of the outstanding Claims Liability or a claims reserve analysis prepared by an appropriate party. Upon receipt of a notice from the Director of the Bureau, the Trustee shall return to the Employer

P.S. §§ 1–1031) and The Pennsylvania Occupational Disease Act (77 P.S. §§ 1201–1603)." (Trust Agreement at 1, "Background").

6. It is undisputed that the excess proceeds are no longer needed. According to an affidavit from Chief George Knehr of the Self–Insurance Division of the Bureau of Workers' Compensation, all workers' compensation claims have been satisfied and, as noted above, the Excess has been paid into an escrow account. (App. I, Tab 17, Ex. B).

7. Moreover, the definition of "Trust Principal" is broad enough to encompass the proceeds of the Letter of Credit as assets of the Trust Fund. In fact, those proceeds were used as assets of the Trust Fund to pay Spring

Ford's workers' compensation claims. Because the proceeds were placed in a segregated account within the Trust Fund does not make them any less Trust Principal.

8. PNC correctly notes that the plain language of Section 2(e) does not provide for any "reversionary interest." Reading Sections 19 and 2(e) together, however, Section 19 states that 2(e) provides a reversionary interest in the employer, Spring Ford, and Section 2(e) provides that the remaining security proceeds are to be distributed as directed by the Bureau. To give both provisions effect, the Court finds that Section 2(e) provides Spring Ford with a reversionary interest in the remaining security proceeds.

so much Trust Principal as the Bureau finds is in excess.

Here, there is no question that the Letter Proceeds are no longer needed to pay compensation claims and that Spring Ford is no longer a self-insurer.[9] Thus, under the operative documents, Spring Ford is entitled to the return of the Trust Principal under Sections 13 and 14.

The Court finds, based on the foregoing interpretation of the Trust Agreement, that PNC does not have any interest in the Excess. That is, Section 19 governs the rights to the Trust Fund Principal and provides that creditors, such as PNC, do not have any rights to the Trust Principal, except as provided under the Acts. As indicated above, PNC has not shown a cause of action under the Acts. Section 19 does, however, provide a reversionary interest in Trust Principal to Spring Ford under Section 2(e). Section 2(e), in turn, provides that, when the Bureau no longer needs the proceeds, the excess may be distributed as directed by the Bureau, and it is undisputed that the Bureau no longer needs the proceeds. Spring Ford, thus, pursuant to Section 19, has a reversionary interest in the excess security remaining after the workers' compensation claims were paid. Moreover, Sections 13 and 14 of the Trust Agreement provide for a reversion of the Trust Principal to Spring Ford when the Trust Agreement or Spring Ford's self-insured status is terminated. Both of these events have occurred here. Thus, the Court finds that Spring Ford has a reversionary interest in the Excess remaining now that all workers' compensation claims have been paid.

## D. EQUITABLE CONSIDERATIONS

Finally, PNC argues that because the purpose of the Letter of Credit was to provide a fund for workers' compensation claims, and the proceeds of the Letter of Credit were never intended to be used for any purpose other than to pay such claims, it would be inequitable to allow Spring Ford (or, more accurately, the estate and the other creditors) to receive a "windfall" of the Excess left over from the payment of the workers' compensation claims.

Spring Ford counters that PNC is a sophisticated banking institution, which could have protected itself in a variety of ways. Spring Ford further notes that, as a creditor, PNC had filed, and the Bankruptcy Court allowed, a proof of claim for an unsecured general claim in the amount of $1,000,000, of which PNC has already received disbursements totaling $528,890.08, and can receive more in the normal course of the administration of the reorganization plan.

■ Bankruptcy courts are essentially "courts of equity and their proceedings are inherently proceedings in equity." *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 567 (3d Cir.2003). These equitable powers, however, "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Thus, courts have declined to use equity to grant rights to an issuer of a letter of credit where the issuer could have contracted for those rights. *See In re Lancaster Steel Co., Inc.,* 284 B.R. 152, 161 (S.D.Fla.2002) (*citing In re Carley Capital Group,* 119 B.R. 646, 650 (W.D.Wis.1990) ("There is no equitable reason to grant such additional rights to the plaintiffs in

---

**9.** *See supra* note 6.

this case since they could have achieved the same protection by contract."); *Briggs v. Goodyear Tire & Rubber Co.*, 79 F.Supp.2d 228, 237 (W.D.N.Y.1999) ("Settled law indicates that the equitable claims of unjust enrichment and constructive trust are unavailable where plaintiffs have rights under a valid and enforceable contract.")).

The Bankruptcy Court here found that all reversionary interests belonged to Spring Ford and declined to exercise its equitable powers, stating that:

> Such a result may, at first blush, seem to provide an inequitable windfall to Debtor given that the clear purpose of the Letter of Credit was to fund workers' compensation claims. It cannot be forgotten, however, that PNC is a sophisticated entity. It could have protected itself in any number of ways, including (1) inserting language in the Letter of Credit that limited the Bureau's draw to anticipated workers compensation claims and costs or requiring refund of any excess; (2) inserting language in the Trust Agreement calling for its own right of reversion to unused Letter Proceeds; or (3) contracting with Debtor for a security interest in other assets. It did none of these things.

*In re Spring Ford Indus.*, 2005 WL 984180, at *5 n. 8, 2005 Bankr.LEXIS 730, at *17 n. 8 (Bankr.E.D.Pa. April 19, 2005).

Although the purpose of the Letter of Credit was to pay for workers' compensation claims, and it is true that PNC is a sophisticated banking entity and may have been able to protect itself, PNC hastens to shed its situationally unwelcome sophistication to explain that the suggested methods of the Bankruptcy Court may not have been possible. For example, the Bureau provided instructions to Spring Ford for completing the Letter of Credit and Trust Agreement that permit no deviation in language from the Bureau's standard letter of credit. In other words, PNC explains that it could not have "bargained" for greater rights in the Letter of Credit. In fact, the Record includes correspondence between PNC and the Bureau indicating that the Bureau requested language to be changed in the original letter of credit, which PNC did change. (App. I, Tab 13, Ex. D–6 at Ex. A). Moreover, PNC could have protected itself by inserting language into the Trust Agreement requiring reversion of the Trust Proceeds to it, or when Spring Ford sought to do business with PNC for the Letter of Credit, PNC could have demanded from Spring Ford a security interest in Spring Ford's other assets which would have assured PNC that it would be a secured creditor rather than one of a number of unsecured creditors as it now finds itself. Of course, though PNC ominously suggests that the marketplace for letters of credit for workers' compensation self-insurers could evaporate to the detriment of the workers' compensation system in the Commonwealth, PNC could have priced its fee to Spring Ford to better reflect its financial risks or, if PNC's assessment suggested risks too great to accept, PNC could have declined this transaction altogether. Suffice it to say, because PNC was not without conventional options at the outset of the relationship,[10] its plea for an equitable "leg up" now is not sufficiently compelling to ignore the documentary or judicial language to the contrary.

## III. CONCLUSION

For the foregoing reasons, PNC's Appeal will be denied. An appropriate Order consistent with this Memorandum follows.

---

**10.** A propos of the situation presented to PNC at the outset of its dealings with Spring Ford, in his defense of Peter Zenger, Andrew Hamilton observed, in 1735: "It is an old and wise caution—That when your neighbour's house is on fire, we ought to take care of our own."

### *ORDER*

AND NOW, this 2nd day of February, 2006, upon consideration of Appellant PNC's Brief (Docket No. 3) and Appellee Spring Ford's Reply (Docket No. 4), it is hereby **ORDERED** that PNC's appeal is **DENIED,** and the Bankruptcy Court's decision is **AFFIRMED.**